ROBT. GREEN, Trustee, Appellant, v. FRED KUBIK, Appellee.

No. 41169.

DECEMBER 17, 1931.

Helmer & Minnich and P. H. Jones, for appellant.

P. W. Harding, for appellee.

KINDIG, J.—Annie M. Green owns a life estate in 280 acres

of land in Carroll County. Before the commencement of this action, Robert Green, the plaintiff-appellant, was duly appointed trustee for said property. On November 12, 1929, the appellant, as such trustee, entered into a written contract with the defendant-appellee, Fred Kubik, wherein the land above named was leased by the former to the latter. Under the lease contract, appellee agreed to furnish all labor, horses, and machinery for the operation of the farm. The live stock was to be owned jointly by the appellant and appellee. Each party was to share equally in the net proceeds from the venture after the payment of operating expenses, exclusive of labor, horses, and machinery.

Appellee, under the lease took possession of the above-named land March 1, 1930. According to the contract, the term of the lease expired March 1, 1933. When the agreement was signed, both appellant and appellee were residents of Tama County. Appellant then lived in the city of Tama, while appellee resided on a farm near by. At that time appellee owned cattle, sheep, hogs, horses, and machinery. For the purposes of the lease, appellant bought a one-half interest in appellee's cattle, sheep, and hogs. Sometime near March 1, 1930, appellee moved the aforesaid property from Tama to appellant's 280-acre farm near Manning.

Soon after appellee reached the farm, appellant appeared, and stayed at the place from time to time during the spring and early summer of 1930. In fact, the work on the farm for that period appears to have been directed very largely by appellant. Early in the farming operations, appellant seemed to feel that his venture with appellee might not be profitable, and he attempted to change the contract from the share-rent basis to one of a cash consideration. That proposition was refused by appellee. This refusal by appellee irritated the appellant, and he is said to have threatened revenge.

The lease provided that appellee was to make certain repairs on the premises. Immediately appellant insisted that fencing be done; so he, together with appellee and the hired men, spent considerable time in building these fences. Apparently appellee and his men worked from two to three weeks during the spring season in erecting the fences. Some fencing still remained to be done when appellee commenced plowing for and planting corn. From time to time appellant continued to insist that the fencing

be completed. On each occasion appellee said he would do the work as soon as the immediate farm duties were performed. During the late summer appellee offered to complete the fences, and appellant then said he would have nothing further to do with the proposition. It seems that appellant was quite arbitrary and unreasonable in many of his demands. Nothing apparently satisfied him. He repeatedly quarreled with the hired men, and caused two of them to leave appellee. Every possible attempt seems to have been made by appellee to comply with appellant's requests on the farm. The record indicates that appellee exercised great patience with appellant at all times.

However, on August 5, 1930, appellant commenced this action to cancel the lease and terminate the relationship. Generally speaking, four reasons are given by appellant why he is entitled to this relief. These reasons are: First, that the relationship between the parties became so strained as to render the continuance of the joint adventure impractical and injurious to both parties, thus making a dissolution of the joint adventure and a cancellation of the contract necessary and advisable; second, that the appellee had violated the contract to the extent that a court of equity is warranted in canceling the same; third, that the appellee failed to exercise due care in the conduct of the co-adventure business. To put the thought differently, appellant here asserts that the appellee grossly mismanaged the co-adventure property, in that he neglected the live stock and cultivated the land in a very unworkmanlike manner; and fourth, that it is apparent that the venture is nonproductive, and being operated at such a loss that the same should be terminated.

Appellant proceeds on the theory that the foregoing relationship between him and appellee is that of a joint adventure. As authority for that proposition he cites Goss v. Lanin, 170 Iowa 57; Dike v. Martin, 204 Pac. 1106 (Okla.); Botsford v. Van Riper, 110 Pac. 705 (Nev.); Walker v. Bruce, 97 Pac. 250 (Colo.). See also Bond v. O'Donnell, 205 Iowa 902. Assuming that the relationship is such, appellant then proceeds further in his argument by contending that it may be terminated on the same basis that a partnership can be dissolved. Upon this proposition he cites Senneff v. Kelleher, 155 Iowa 82; Boiler & Welding Co. v. Minnetonka Lumber Company, 229 Pac. (Okla.) 1045; Irvine v. Campbell, 141 N. W. (Minn.) 108; Keiswetter

v. Rubenstein, 209 N. W. (Mich.) 154; Meinhard v. Salmon, 164 N. E. (N. Y.) 545.

For the purposes of this case, we assume, without deciding, that such is the law. We expressly refrain from holding that the relationship between appellant and appellee was that of a joint adventure or partnership. Nevertheless, even on that basis, appellant is not entitled to a cancellation of the contract under the facts and circumstances revealed in the present record.

I. It is first contended by appellant, as before indicated, that the relationship between the parties became so strained as to render the continuance of the joint adventure impractical and injurious to both parties, thus making a dissolution of the same necessary and advisable.

Similar questions have confronted courts in this and other jurisdictions. In a general way, it can be said that a partnership or joint adventure for a fixed term may be dissolved before the time stipulated when the parties become so quarrelsome and incompatible as to render the continuance of the relationship impractical and injurious. Blake v. Dorgan, 1 G. Greene (Iowa) 537; Levi v. Karrick, 8 Iowa 150; 47 Corpus Juris 1120, Sec. 787; Fooks v. Williams, 87 Atl. (Md.) 692; Whalen v. Stephens, 61 N. E. (Ill.) 921. But before such relief can be granted, the preliminary facts and circumstances must exist. As said in Levi v. Karrick, supra (8 Iowa 150), on page 154:

"A partnership will not be dissolved for trifling faults and misbehavior of one of the partners which do not go to the substance of the contract * * *."

See also 47 Corpus Juris 1119, Sec. 784; 20 Ruling Case Law 958, Sec. 182.

Moreover, in order to warrant a dissolution in the case at bar, both parties must enter into the quarreling and bickering, etc. Upon what theory the courts reach that conclusion is not now material, because it is certain that the quarreling and bickering must be joined in by both parties to warrant a dissolution of the partnership, regardless of the theory on which such bickering and quarreling may, under proper circumstances, entitle either party to such dissolution. Some authorities, however, reach the conclusion that the bickering and quarreling must be joined in by both parties before the contract of partnership can

be terminated, upon the theory that, when both parties enter into the bickering and quarreling, they thereby by implication mutually consent to a dissolution of the relationship. Whether this is the reason why a partnership should be dissolved for the bickering and quarreling of the partners, we need not now decide. Assuming, however, as some courts say, that by bickering and quarreling the partners impliedly consent to a dissolution, yet, even under that doctrine, the appellant is not entitled to such relief here, because the appellee did not enter into the bickering and quarreling.

Hence, if appellant by his quarrelsome and bickering attitude were permitted to force a cancellation of the agreement while appellee remained innocent of any wrong, the termination of the contract would be effected without appellee's implied consent, under the theory supposed. 20 Ruling Case Law 958, Sec. 182. See Blake v. Dorgan, supra (1 G. Greene (Iowa) 537, local citation 541). To put the thought differently, each party must, under the supposed theory, enter into the quarreling and bickering to the extent that both impliedly accept a dissolution of the partnership. See authorities above cited. The question, then, is, Are the facts and circumstances presented in the record before us sufficient to indicate that both appellant and appellee, under any theory of the law, quarreled and bickered to the extent that the lease can be terminated before the time specified for the expiration thereof. Obviously this question must be answered in the negative. From the beginning until the present time, appellant has done all the quarreling and bickering. Appellee has never entered into the bickering and quarreling. Before appellee came upon the premises, appellant quarreled with the former tenant, and that tenant left the farm before the term of his lease expired. Joseph Kubik, appellee's father, warned the latter before he signed the lease that appellant was quarrelsome. However, appellant assured appellee that the farming venture would be profitable and pleasant. Appellant, it appears, nevertheless quarreled with every hired man kept by appellee on the farm in question. Those quarrels between appellant and at least one hired man became so serious that blows were struck. These hired men extremely disliked to have appellant come to the farm, give orders, and complain. At all times appellant was the aggressor, and the one who bickered and tried to quarrel

with appellee. It is observable that appellee did not enter into the quarreling and bickering, as before explained.

Dissolution, then, on the ground under consideration cannot be granted appellant, because appellee did not enter into the bickering and quarreling.

II. Furthermore, it is claimed by appellant that the appellee has violated the contract to the extent that a court of equity is warranted in canceling the same. This charge of disregarding the contract is more specifically stated as follows: First, that appellee did not properly cut and eradicate obnoxious weeds, according to the lease; second, that appellee did not properly and timely cultivate the land; and third, that appellee did not properly feed and care for the hogs, cattle, and sheep. Wherefore appellant claims that he is entitled to relief under authority of the following cases: Lisco v. Husmann, 152 N. W. (Nebr.) 383; Nichols v. Mumford, 181 N. W. (Mich.) 1022. Plainly, those cases are not in point. Here it is not proven that appellee has abandoned the joint adventure or is acting in disregard thereof. Nor is it charged in the pleadings or proven by the evidence that appellee has done anything fraudulent.

Consideration will first be given to appellant's complaint that obnoxious weeds were not cut or eradicated. The testimony concerning these weeds is somewhat conflicting. Photographs were introduced in evidence by appellant to show the existence of weeds. Likewise, witnesses testifying for appellant stated that there were obnoxious weeds on the farm. Also, appellant himself so testified. These weeds consisted of Canadian thistles, cockleburs, etc. Apparently appellee at appellant's request plowed up an old hog yard. Because the ground therein was very hard, appellee experienced difficulty in properly cultivating the corn planted thereon. Sunflowers grew on this particular tract. On the other parts of the farm, witnesses testified, there were cockleburs, Canadian thistles, and other obnoxious weeds. Most of the witnesses for appellant who testified concerning these weeds were brought by him from Tama County. For some reason, appellant did not rely on local witnesses.

There is evidence in the record tending to overcome the testimony of those witnesses. Neighbors testifying for appellee stated that the farm was not unusually weedy during 1930. Appellee's hired men stated on the witness stand that they, at

the former's direction, cut the weeds in due season, and that the fields and meadows were comparatively clean. The hired men also said that the weeds along the roads were cut with a mower and scythe. Furthermore, appellee himself testified to the same effect. Cockleburs and other obnoxious weeds in the fields were pulled or hoed by appellee and his hired men. It is to be remembered that appellant's difficulty with the previous tenant was that the weeds were not eradicated. This particular farm was especially foul with obnoxious weeds when appellee took possession thereof. Under the entire record, therefore, we are constrained to hold that appellee substantially complied with the lease in eradicating the weeds.

Review now will be made of the record relating to appellant's claim that appellee did not properly and timely cultivate the land. According to the lease, manure must be hauled from the barns and stables and properly spread upon the land. Appellant insists that this was not done. A photograph presented, it is said, shows manure in the feed yard. Contrary to that claim, it is stated by appellee and his witnesses that the manure was properly hauled. Hired men testified that practically all manure was taken from the yards and spread upon the land. They say that over 160 loads were so hauled. What is shown in the photograph, these witnesses explain, was the butt of an old straw stack where the cattle were still feeding. Therefore, a preponderance of the evidence indicates that the manure was properly hauled.

Continuing his complaint, appellant says that appellee failed to rebuild all the fences. It will be recalled that appellee and his hired men spent two weeks or more in the spring reconstructing these fences. Because the season was becoming late, appellee quit building fences and commenced plowing for and planting corn. From time to time, appellee promised appellant that he would complete reconstructing the fences when the opportunity presented itself. Later in the summer, appellee offered to thus finish the fence building, when appellant declared that he was through with the matter and would have nothing more to do with the contract. Hence it cannot fairly be said that the appellee violated his contract in that respect.

A complaint is also made by appellant because the appellee did not properly plow the ground. Here the contention seems

to be that appellee "cut and covered" when plowing. Appellee and his witnesses contradict this, and say that the plowed ground did not look well because the soil was so dry and hard. Apparently a neighbor did some plowing for appellee, and he said that the ground was plowed six inches or more deep, but that the work did not look smooth because of the dry ground.

Again, the contention is made by appellant that the corn was not sufficiently cultivated. According to the evidence, the corn was plowed three times and the fields were comparatively clean. The yield of both corn and small grain was good, when the dry season is considered. Appellant, it seems, makes no complaint concerning the yield or quality of either the corn or the grain. Early in the season appellant himself supervised the work. This included the seeding and the planting of the corn. While there is some dispute concerning the number of times the fields were harrowed, etc., it appears by the testimony of appellee and his hired men that they properly complied with good husbandry in this regard. No doubt appellee was not a first-class farmer, but apparently he managed and conducted the work as an average tenant farmer.

Other complaints are made; but, after carefully considering the entire record, it is evident to us that appellant has no basis under this particular alleged grievance to set aside the contract.

Pursuing further his attack upon appellee's fulfillment of the contract, appellant argues that his tenant did not properly feed and care for the hogs, cattle, and sheep, As on the other matters of which complaint is made, the evidence is in conflict. Many of the animals died, yet it does not appear that appellee was entirely responsible for the loss. For instance, early in the spring young pigs, at appellant's own instance and request, were turned from the sheds into the pasture. A cold rain came, and the smaller pigs especially were chilled. Later some of them died. It seems that the hog house was not suitable for properly raising these animals. Appellee called a veterinarian, who informed him that the general conditions on the farm were not conducive to the successful raising of healthy hogs. On at least one occasion appellee desired to purchase some stock food for the hogs, but appellant objected. Appellant himself castrated several of the male pigs. This was done in a manner objectionable to appellee. Subsequently the hogs swelled, and some of

them died. The hogs, it seems, were properly fed and watered by appellee. While these animals are not in first-class condition and have not grown as rapidly as anticipated, yet, according to the record, they are neither abnormal nor scrawny. Considering everything in the record, we cannot say that appellee has violated his contract in caring for those hogs.

Some of the sheep died, but appellant has not proven that the loss was due to the neglect, carelessness, or inefficiency of appellee. Apparently there was not a suitable place on the farm to house the sheep, and some of them died. Under all the circumstances, it seems that appellee did as well with these animals as could be expected.

Both old and young cattle died. Two animals at least were condemned as tubercular, and disposed of accordingly. One old cow was turned out on the road, at appellant's request, and went down to the creek, where it became mired. The animal was taken from the creek by the use of a block and tackle, and later died. Several of the young calves also died. A complaint is made by appellant because the appellee did not chain or rope the calving cows in the barn, but permitted them to run at large with other cattle. Through such alleged neglect, appellant contends, many of the calves were lost. Once more there is a conflict in the evidence. Appellee and his hired men testified that the cows were chained or roped in the barn. It seems that the cattle are rather thin, due undoubtedly to the poor pasture caused by the dry weather. There is something in the record, too, concerning the fact that there was not sufficient water on the farm to satisfy the cattle at all times. According to the hired men and appellee, corn was cut in the fall and thrown into the pasture for the cattle. While it is true that a good many died, yet under all the circumstances we cannot say that appellee, rather than appellant, was responsible therefor.

Consequently, after considering the whole record, we are constrained to find that appellee has substantially complied with his contract.

III. In the third place, appellant says that the appellee failed to exercise due care in the conduct of the joint adventure business. What has already been said applies here to a large extent. Repetition would be of no avail. Reference is made to the foregoing discussion. Until the present suit was commenced,

772

appellee endeavored to comply with appellant's suggestions. This he did to the extent of discharging two employees entirely satisfactory to himself.

Without repeating the discussion in Proposition II above, we conclude by saying that appellant has failed to prove that appellee did not exercise due care in managing the business of the joint adventure.

IV. Finally, it is urged by appellant that the venture is nonproductive, and being operated at such a loss that the same should be terminated.

Obviously the appellant has not met the burden of proof at this juncture. It fairly appears from the testimony that these parties now have 2,000 bushels of corn, 2,200 bushels of oats, and 600 bushels of barley. In addition to the grain, they have over 100 hogs, about 60 head of cattle, and 13 sheep. That grain was grown, the old stock kept, and the young animals raised in a dry season, under unfavorable conditions. Therefore it cannot be said that the venture is nonproductive, or being operated at a loss. By so concluding, we do not hold that, in any event, nonproductiveness or loss would constitute a basis for the dissolution of the relationship.

Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—Affirmed.

FAVILLE, C. J., and EVANS, MORLING, and GRIMM, JJ., concur.