BPR Group Limited Partnership *vs.* Richard K.
Bendetson & others.[1]

Suffolk. February 2, 2009. - May 21, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Contract,* Joint venture. *Joint Enterprise. Uniform Partnership Act. Partnership,* Agreement, Dissolution. *Damages,* Breach of partnership agreement, Interest.

In an action brought in Superior Court by a limited partnership (plaintiff) seeking, inter alia, a judgment declaring that notices it had sent to the defendants dissolved their real estate joint ventures under G. L. c. 108A, § 31 (1) (*b*), the judge, in hearing motions for summary judgment, properly concluded that the joint ventures were not at will (and therefore not subject to dissolution under § 31 [1] [*b*]) because the joint venture agreements set forth the circumstances in which the joint ventures could be dissolved, none of which had occurred in the instant case [860-865]; however, where a genuine issue of material fact existed concerning the counts of the plaintiff's complaint seeking decrees of dissolution of the joint ventures on equitable grounds pursuant to G. L. c. 108A, § 32 (1) (*f*), the judge erred in granting summary judgment on those counts [865-869]. Gants, J., concurring in part.

Discussion of issues concerning damages [869-870] and prejudgment interest [870-871] that could arise on the remand to the Superior Court of a civil action involving the dissolution of real estate joint ventures.

Civil action commenced in the Superior Court Department on January 13, 2004.

Motions for partial summary judgment were heard by *Allan van Gestel,* J., and the case was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas N. O'Connor (David B. Mack* with him) for the plaintiff.

*Albert P. Zabin* for the defendants.

Spina, J. The plaintiff, BPR Group Limited Partnership (BPR),

---

[1]CDE Revere, LLC (CDE); and Carson Revere, LLC (Carson).

sent notices of dissolution purporting to dissolve three real estate joint ventures with the defendants, Richard K. Bendetson (Bendetson); CDE Revere, LLC (CDE); and Carson Revere, LLC (Carson), pursuant to G. L. c. 108A, § 31 (1) (*b*), which allows a joint venturer in certain circumstances to dissolve unilaterally a joint venture without thereby causing a breach of the joint venture agreement. Such agreements have become known as "at-will" joint venture agreements.[2] The defendants refused to acknowledge BPR's notices as effectuating dissolution under G. L. c. 108A, § 31 (1) (*b*), prompting BPR to file a complaint in the Superior Court seeking a declaratory judgment that its notices had dissolved the joint ventures under G. L. c. 108A, § 31 (1) (*b*),[3] or, alternatively, decrees dissolving the joint ventures on equitable grounds under G. L. c. 108A, § 32 (1) (*f*).[4] The defendants counterclaimed that the notices of dissolution effectively dissolved the joint ventures in contravention of the joint venture agreements under G. L. c. 108A, § 31 (2).[5]

A judge in the Superior Court resolved the liability phase on cross motions for partial summary judgment in two stages. He initially addressed whether the joint ventures were at will, and ruled that they were not at will because the joint venture agreements set forth the exclusive circumstances under which they could be dissolved. The judge further concluded that the notices operated to dissolve the joint ventures in contravention of the joint venture agreements. However, he expressly gave BPR leave to show that it was entitled to an order of equitable dissolution. After the parties conducted further discovery, he considered whether dissolution was appropriate on equitable grounds. He

[2]The parties agree that the Uniform Partnership Act (UPA), G. L. c. 108A, §§ 1 et seq., applies to this case. See *Doiron* v. *Castonguay*, 401 Mass. 705, 707 n.2 (1988).

[3]General Laws c. 108A, § 31 (1) (*b*), states that dissolution is caused "[b]y the express will of any partner when no definite term or particular undertaking is specified . . . ."

[4]General Laws c. 108A, § 32 (1) (*f*), provides: "On application by or for a partner the court shall decree a dissolution whenever . . . [o]ther circumstances render a dissolution equitable."

[5]General Laws c. 108A, § 31 (2), provides that dissolution is caused "[i]n contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time . . . ."

allowed the defendants' motion for summary judgment as to the counts of BPR's complaint seeking decrees of dissolution on equitable grounds, which had the effect of reaffirming his earlier ruling that the joint ventures were dissolved in contravention of the joint venture agreements by BPR's notices.

Following a trial to determine the value of BPR's interest in the joint ventures as of the date of the dissolutions and the damages, if any, incurred by the defendants as a result of the dissolutions, an order issued awarding BPR $2,759,098, less the defeasance fees associated with two mortgages on property belonging to the joint ventures; the costs of refinancing those mortgages; and postdissolution distributions made to BPR. BPR's request for prejudgment interest was denied.

BPR appealed, arguing that the joint ventures were at will, and even if they were not at will, the judge should have held an evidentiary hearing to determine whether the joint ventures should have been dissolved on equitable grounds. It further argues that assuming the joint ventures were dissolved in contravention of the joint venture agreements, the judge erred in concluding that the defeasance fees and costs of refinancing resulted from the dissolution, and in denying BPR's request for prejudgment interest. We transferred the case to this court on our own motion.

Considerable confusion has resulted from the fact that the liability phase of this case occurred in two stages of motions for partial summary judgment. As we explain *infra*, for purposes of this appeal, by abandoning certain positions, the parties implicitly have accepted the judge's determinative structure of the case, namely, that the joint ventures would be deemed dissolved by notice in contravention of the joint venture agreements unless BPR could prove it was entitled to equitable dissolution. More specifically, BPR has abandoned its claim that a notice purporting to dissolve an at-will joint venture is ineffective to dissolve a joint venture that is not at will. Similarly, the defendants have abandoned their claim that BPR is not entitled to equitable dissolution where the judge earlier ruled the agreements were dissolved by notice.

For the reasons that follow, we agree with the judge that the joint ventures were not at will because the joint venture agreements set forth the circumstances under which the joint ventures

could be dissolved. However, because we conclude that a genuine issue of material fact exists concerning the counts of BPR's complaint seeking decrees of dissolution of the joint ventures pursuant to G. L. c. 108A, § 32 (1) (*f*), we reverse the grant of partial summary judgment on those counts. We also address BPR's arguments concerning damages in the event that BPR does not succeed on its claim for equitable dissolution under G. L. c. 108A, § 32 (1) (*f*), on remand.

1. *Background.* We summarize the following additional facts,[6] reserving details concerning damages for later discussion.

Atlantic Corporation, Bendetson, Robert L. Buonato (Buonato), Herbert Carver, and C. Gerard Drucker entered into three joint venture agreements in 1980 and 1981.[7] The joint ventures were formed for purposes of acquiring, operating, and developing several parcels of real estate. Section 4 of all three agreements states:

> "Term. This Agreement shall commence as of the date hereof and shall continue and not be dissolved or terminated except as hereinafter provided."

Section 11 of each agreement provides:

> "This Joint Venture shall terminate upon the first to occur of the following events:

> "1. Upon notice of any non-defaulting Member, if any other Member shall fail to perform his or its obligations hereunder and such default shall continue uncured for a period of at least sixty (60) days after written notice thereof from the party claiming such default; the party desiring to terminate under this provision shall, after the expiration of the sixty (60) day period, give one (1) month's written notice of his or its intention to terminate.

---

[6]The defendants have not disputed any facts concerning the relationship between Richard K. Bendetson (Bendetson) and the various members of BPR Group Limited Partnership (BPR). To the extent they might have disputed those facts in their motion for summary judgment as to the counts of BPR's complaint seeking decrees of dissolution on equitable grounds, we view the facts in the light most favorable to the nonmoving party. See *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 539 (1995).

[7]Atlantic Corporation owned a twenty-five per cent interest in each joint venture. C. Gerard Drucker and Herbert Carver coowned Atlantic Corporation.

"2. Upon the conveyance of all the real estate comprising the Property.

"3. At the option of any Member not in default within a reasonable time after notice that any other Member shall have had filed by or against him pursuant to a statute of the United States or of any statute, a petition in bankruptcy or insolvency or for the appointment of a receiver or trustee of all or a portion of such other party's assets and such other party fails within sixty (60) days to secure a discharge thereof, or if such other party shall make an assignment for the benefit of creditors or petition for or voluntarily enter into an arrangement for the benefit of creditors.

"4. By mutual agreement of all of the Members."

The agreements further provide that Bendetson's company, Diversified Funding, Incorporated (Diversified), would manage the properties of the joint ventures.

Buonato's interests subsequently were assigned to BPR, the vehicle through which Buonato, his wife, Barbara Buonato, and their son, Robert, participate in the joint ventures. Drucker's interests, including his one-half share of Atlantic Corporation's interest, were transferred to CDE. Carver's interests, including Atlantic Corporation's other half-share, were transferred to Carson.

In the late 1990's, relations between Buonato and Bendetson began to sour. In or around 1997, Buonato found it increasingly difficult to obtain information about the properties from Bendetson directly and resented being referred to Bendetson's chief financial officer, Garry Cuneo, for such information. Buonato also became concerned that Diversified was letting at least one of the properties "slide into a slum," observing that the hallways, elevator, and grounds were in unsatisfactory condition.[8]

In or around October, 1999, Buonato and his wife expressed their dissatisfaction with Bendetson to Drucker. In addition to their concerns about Bendetson's management of the joint venture property, they were upset that Bendetson had ignored their

---

[8]BPR does not argue that Diversified's management of the joint ventures' properties formed the basis for dissolution of the joint ventures.

requests to pay off a loan made by Bendetson's father to a Buonato-Bendetson real property endeavor unaffiliated with the joint ventures. The interest on the loan was eighteen per cent and yielded a $750 monthly interest payment to Bendetson's father.

In or around March, 2000, Buonato learned that $300,000 had been transferred from the joint ventures' account to Bendetson's personal account.[9] Bendetson subsequently replaced the $300,000, and later explained that Cuneo had transferred the money without Bendetson's knowledge. Carver and Drucker were satisfied with Bendetson's explanation and replacement of the funds, but Buonato was not. Buonato suspected that Bendetson had misappropriated the money from the joint ventures, and had worked out some sort of deal with Carver and Drucker.

A meeting between the joint venturers was scheduled for August 16, 2000. Bendetson suggested that the Buonatos (on behalf of BPR), Carver, and Drucker submit questions for him before the meeting so he could prepare for the meeting. Buonato sent Bendetson a number of questions primarily concerned with the finances of the joint ventures. A couple of weeks before the meeting, Drucker drafted and circulated an agenda to all the joint venturers, which incorporated many of Buonato's questions and concerns. The meeting was not successful. Bendetson began the meeting by reading from a prepared statement, which angered Buonato who apparently expected Bendetson to answer the questions he had sent to him beforehand. When Bendetson declined to answer Buonato's questions, Buonato got out of his chair and began to yell at Bendetson. Drucker attributed Buonato's conduct to "a history and a litany of things that have built up to that day," and later admitted that it was fair to say that Buonato and Bendetson could not stand one another and that the relationship had been damaged beyond repair.[10]

By December, 2003, at least four other real estate endeavors involving the Buonato family and Bendetson had also deteriorated and were the subject of litigation. Buonato was particularly

---

[9] About the same time, Robert L. Buonato (Buonato) received a telephone call from Bendetson, who was distraught. During this telephone call, Buonato learned that Bendetson "had blown his business; and he lost all his money and what have you."

[10] In or around that time, Bendetson lost his trust in Buonato and his wife.

upset about a lawsuit Bendetson brought against his son, Robert, to recover excess distributions Robert had received from one of the real estate endeavors. The acrimony wrought by these litigations hardened Buonato's lack of trust in Bendetson, which spilled over into the joint ventures. Bendetson characterized the nature of communications between the Buonato family and himself from 2000 to 2003 as "[s]trained."

On December 22, 2003, Buonato, as president of BPR, sent notices of dissolution of all three joint ventures to the defendants. As the ground for dissolution, these notices cited G. L. c. 108A, § 31 (1) (b), which provides that a partnership may be dissolved at any partner's election if the agreement lacks a "definite term" or "particular undertaking."

On January 13, 2004, BPR filed a complaint in the Superior Court, seeking, inter alia, a declaratory judgment that the notices dissolved the joint ventures under G. L. c. 108A, § 31 (1) (b), or alternatively, decrees of dissolution pursuant to G. L. c. 108A, § 32 (1) (f). The defendants answered, denying that dissolution was governed by G. L. c. 108A, § 31 (1) (b), and counterclaimed that BPR's dissolution was in contravention of the agreements. On cross motions for partial summary judgment as to whether the joint ventures were at will, BPR and the defendants agreed that termination had not occurred under § 11 of the joint venture agreements, but disagreed as to whether the notices dissolved the joint ventures under G. L. c. 108A, § 31 (1) (b), or G. L. c. 108A, § 31 (2).[11] The judge concluded that §§ 4 and 11 were "sufficiently definite terms as to how the agreements are to be dissolved to make the agreements not at will." He concluded that BPR's notices dissolved the joint ventures in contravention of the joint venture agreements under G. L. c. 108A, § 31 (2).[12] However, he also indicated that he would consider giving BPR an opportunity to show that it was entitled to equitable dissolution under G. L. c. 108A, § 32 (1) (f).

---

[11]Nothing in the record indicates if there was any discussion as to whether BPR's notices, which purported to dissolve the joint ventures under G. L. c. 108A, § 31 (1) (b), could be deemed to have dissolved the joint ventures under G. L. c. 108A, § 31 (2), if G. L. c. 108A, § 31 (1) (b), did not apply.

[12]BPR moved to report the case to the Appeals Court or, in the alternative, issue a separate and final judgment. See Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). Both requests in the motion were denied.

After the parties conducted further discovery, the judge considered the defendants' motion for partial summary judgment with respect to the counts of BPR's complaint seeking equitable dissolution of the joint ventures pursuant to G. L. c. 108A, § 32 (1) (*f*). See note 4, *supra*. BPR, citing the discord between BPR's members and Bendetson, opposed the motion. In April, 2006, the judge allowed the defendants' motion, reasoning that Buonato's loss of confidence in Bendetson did not fall within any of the circumstances enumerated under G. L. c. 108A, § 32 (1) (*c*)-(*e*), and thus did not fall under G. L. c. 108A, § 32 (1) (*f*). The judge noted that the joint ventures had been highly profitable, that Buonato had seldom been involved in their day-to-day operation, and that neither CDE nor Carson had any expressed concern about Bendetson's management of the joint ventures' properties.

After a trial to determine the value of BPR's interests in the joint ventures and the damages suffered by the defendants as a result of the dissolutions, the judge, using the going concern method, see *Anastos* v. *Sable*, 443 Mass. 146, 149 (2004), found that BPR's interest was worth $2,759,098. He also found that, if the defendants refinanced two mortgages on two properties to raise money to buy BPR's interests, the defendants would incur damages in the form of defeasance fees and other costs associated with refinancing, and would be entitled to deduct those costs from BPR's judgment.[13] The judge additionally ordered the deduction of any distributions made to BPR after December 23, 2003.

The defendants subsequently submitted an affidavit stating that the defeasance fees and refinancing costs totaled $352,103.72. That amount was later reduced to $311,843.40 to account for the savings inuring to the defendants as a result of refinancing. After deducting the refinancing costs, including the defeasance fees, and $548,313.47 in postdissolution profits distributed to BPR, judgment in the amount of $1,898,941.13 entered for BPR.

2. *Discussion.* (a) *Dissolution under G. L. c. 108A, § 31 (1).*

---

[13]As we explain later in our discussion of damages, the terms of the mortgage agreements provided that the commencement of dissolution proceedings constituted a default on the mortgages, rendering the joint ventures immediately liable for the entire balance of the mortgages as well as certain fees. See note 25, *infra*.

Although this case involves joint ventures, the Uniform Partnership Act (UPA), codified at G. L. c. 108A, §§ 1 et seq., "is generally applicable to joint ventures by analogy, though it does not govern directly." *Doiron* v. *Castonguay*, 401 Mass. 705, 707 n.2 (1988). The UPA "is intended to be a type of 'form contract.' " *Meehan* v. *Shaughnessy*, 404 Mass. 419, 430 n.7 (1989). Consequently, parties may vary the provisions of the UPA, which generally supplies default terms. See, e.g., *id.* This case requires us to determine the extent to which §§ 4 and 11 of the joint venture agreements varied the dissolution provisions set forth in G. L. c. 108A, § 31 (1).

Section 31 (1)-(5) enumerates the ways in which a partnership may be dissolved by actions of the partners themselves. See *Infusaid Corp.* v. *Intermedics Infusaid, Inc.*, 739 F.2d 661, 665-666 (1st Cir. 1984). Under this section, a partner causes dissolution "by his 'express will . . . at any time.' " *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 591 (1975), quoting G. L. c. 108A, § 31. The consequences flowing from dissolution by express will depend on whether the dissolution occurred without violation, or in contravention, of the agreement. See G. L. c. 108A, §§ 31 (1)-(2), 38.

General Laws c. 108A, § 31 (1), provides, in pertinent part, that dissolution is caused:

"(1) *Without violation of the agreement between the partners,*

"(*a*) By the termination of the definite term or particular undertaking specified in the agreement,

"(*b*) By the express will of any partner when no definite term or particular undertaking is specified . . ."[14] (emphasis added).

Section 31 (2) states that dissolution occurs:

"*In contravention of the agreement between the partners,*

---

[14]Dissolution also may be caused without violation of the agreement between the partners by either the express will of all partners, G. L. c. 108A, § 31 (1) (*c*), or "[b]y the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners." G. L. c. 108A, § 31 (1) (*d*).

where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time . . ." (emphasis added).

In addition to several other causes of dissolution not here relevant, see G. L. c. 108A, § 31 (3)-(5), dissolution also may be caused "[b]y decree of court under section thirty-two." G. L. c. 108A, § 31 (6). In contrast to G. L. c. 108A, § 31, dissolution under G. L. c. 108A, § 32, occurs on application by or for a partner to a court. See *Infusaid Corp.* v. *Intermedics Infusaid, Inc.*, *supra* at 665. Under G. L. c. 108A, § 32, a court may decree dissolution if:

"(*a*) A partner has been declared a lunatic in any judicial proceeding or is shown to be of unsound mind,

"(*b*) A partner becomes in any other way incapable of performing his part of the partnership contract,

"(*c*) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business,

"(*d*) A partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him,

"(*e*) The business of the partnership can only be carried on at a loss,

"(*f*) Other circumstances render a dissolution equitable."

If a partnership is "at will," i.e., it lacks a "definite term" or "particular undertaking," G. L. c. 108A, § 31 (1) (*b*), dissolution by express will occurs "[w]ithout violation of the agreement between the partners," § 31 (1), and, unless the partnership agreement provides otherwise, the dissolving partner is entitled to compel liquidation of the partnership's assets to pay the partnership's debts and obtain a cash amount commensurate with the dissolving partner's interest. See G. L. c. 108A, § 38 (1). If,

however, a partnership is dissolved "in contravention of the agreement between the partners," § 31 (2), then the dissolving partner is liable for any damages caused by dissolution, see G. L. c. 108A, § 38 (2) (*a*) (II), and the remaining partners may elect to continue the partnership for the duration of the agreed-upon term or particular undertaking. See G. L. c. 108A, § 38 (2) (*b*). In the case of a wrongful dissolution, the value of the dissolving partner's interest is determined according to the going concern method, see *Anastos* v. *Sable, supra* at 152, which may entitle the dissolving partner to less than the partner would have received had dissolution not occurred in contravention of the partnership agreement. See, e.g., *id.* (applying forty per cent minority shareholder discount to value of partnership's net assets).

The first question raised is whether the joint ventures were at will. If the agreements were at will, and if BPR's notices dissolved the joint ventures, then BPR was entitled to compel liquidation of the partnership's assets and a judgment. If, however, the agreements were not at will and the notices dissolved the joint ventures in violation of the joint venture agreements, then the remaining partners could elect to continue the joint ventures, BPR's interest properly was valued according to the going concern method, and BPR was liable for damages resulting from the dissolutions.

We conclude that the joint venture agreements were not at will. In its brief, BPR focuses on whether the joint venture agreements specify "definite terms" or "particular undertakings." G. L. c. 108A, § 31 (1). However, analysis under G. L. c. 108A, § 31 (1) (*b*), is inapposite. The UPA applies only "when there is either no partnership agreement governing the partnership's affairs, the agreement is silent on a particular point, or the agreement contains provisions contrary to law." *Creel* v. *Lilly*, 354 Md. 77, 99 (1999). See *Meehan* v. *Shaughnessy, supra* at 430 n.7. Where an agreement addresses a particular issue, the terms of the agreement control, and the rights and obligations of the parties are determined by reference to principles of contract law. See *Knapp* v. *Neptune Towers Assocs.*, 72 Mass. App. Ct. 502, 508 n.9 (2008) ("Courts interpret partnership agreements in accordance with general contract principles"); 2 A.R. Bromberg & L.E. Ribstein, Partnership § 6.01 (c), at 6:6-6:7 n.4 (Supp. 2008).

See also *Chokel* v. *Genzyme Corp.*, 449 Mass. 272, 278 (2007) (rights of shareholders arising under contract governed by principles of contract law and not by fiduciary principles that would otherwise apply). Thus, an agreement specifying the circumstances under which a partnership may be dissolved is not at will.[15] See *In re Popkin & Stern*, 340 F.3d 709, 714 (8th Cir. 2003) (partnership agreement's dissolution terms supplanted Missouri UPA); *Dental Health Assocs.* v. *Zangeneh*, 34 A.D.3d 622, 624 (N.Y. 2006) (partnership not dissolved under statute by noticing other partner of dissolution where noticing other partner was insufficient to dissolve partnership under partnership agreement); *Hunter* v. *Straube*, 273 Or. 720, 726-730 (1975) (filing lawsuit dissolved partnership in contravention of partnership agreement specifying circumstances under which partnership could be dissolved). See also *Cominos* v. *Kalkanes*, 37 Wash. 2d 843, 848 (1951) ("It is always open to parties to provide in any agreement they may make, how and under what circumstances, their business relationship may be terminated").

Here, § 11 of the joint venture agreements addresses dissolution; it specifies that dissolution may transpire in four circumstances, none of which had occurred here. When read in conjunction with § 4, which provides that dissolution may not occur except as provided by the joint venture agreement, § 11 demonstrates that the joint ventures are not at will. Therefore, G. L. c. 108A, § 31 (1) (*b*), does not apply. See *In re Popkin & Stern, supra*; *Dental Health Assocs.* v. *Zangeneh, supra*; *Hunter* v. *Straube, supra.* See also *Meehan* v. *Shaughnessy, supra* at 433 n.12.[16] Accordingly, dissolution, if not warranted by G. L.

---

[15]In a number of cases, mostly involving oral partnership agreements, this court has held that the omission of a certain term of duration renders the partnership at will. See *Johnson* v. *Kennedy*, 350 Mass. 294, 298 (1966); *Murray* v. *Bateman*, 315 Mass. 113, 115 (1943); *Fletcher* v. *Reed*, 131 Mass. 312, 313 (1881). However, none of the partnership agreements in those cases appears to have set forth the circumstances under which the partnership could be dissolved without breaching the partnership agreement.

[16]The cases relied on by BPR are inapplicable. In *Miami Subs Corp.* v. *Murray Family Trust*, 142 N.H. 501 (1997), and *Girard Bank* v. *Haley*, 460 Pa. 237 (1975), the agreements did not contain dissolution terms. *Tropeano* v. *Dorman*, 441 F.3d 69 (1st Cir. 2006), also is distinguishable. There, the parties executed a partnership agreement for a thirty-year term in 1964. *Id.* at 70. The agreement was modified in 1987 to include a termination provision stating

c. 108A, § 32 (1) (*f*), occurred "[i]n contravention of the agreement between the partners . . . ." G. L. c. 108A, § 31 (2).

As previously noted, in his ruling that the joint ventures were not at will and that they had all been dissolved by BPR's notices of dissolution dated December 22, 2003, the judge allowed BPR the opportunity to show it was entitled to equitable dissolution. The parties moved for clarification and reconsideration. The defendants sought clarification as to how there could be equitable dissolution when the judge found dissolution occurred by notice. The judge recognized the understandable confusion in his ruling, and he issued a written decision that emphasized his conclusion that "the three joint ventures were dissolved by BPR pursuant to G. L. c. 108A, [§] 31 (2), on December 22, 2003, in a manner that was in contravention of the joint venture agreements," but he stated he was giving BPR the opportunity to show, as alleged in its complaint, that it was entitled to equitable dissolution, basically nunc pro tunc to December 21, 2003. He acknowledged he was proceeding in this manner because the different theories of dissolution that were raised in the case were not being presented to him at the same time, but rather in serial manner.

Thereafter BPR abandoned its argument that the December 22, 2003, notices of dissolution were expressly invoking the authority of § 31 (1) (*b*), and that they could not effectuate dissolution under § 31 (2), as the judge found. See *Fischer* v. *Fischer*, 197 S.W.3d 98, 106 (Ky. 2006) (letter claiming to dissolve allegedly at-will partnership under statutory equivalent of § 31 [1] [*b*] ineffective to dissolve partnership that was not at will). In addition, the defendants do not argue, as they did below, that BPR's notices of dissolution dissolved the joint ventures when the defendants received the notices, obviating the possibility of equitable dissolution under § 32 (1) (*f*).

(b) *Judicial dissolution under G. L. c. 108A, § 32 (1) (f).*

that the partnership could "be terminated by a vote of not less than 60% interest of 100%" and provided that, except as modified, the 1964 agreement was affirmed. *Id.* at 71, 72. Nothing in the 1987 modification altered the thirty-year term. Therefore, the court reasoned, the partnership agreement, as modified by the termination provision, expired in 1994 and the partnership became an at-will endeavor thereafter. *Id.* at 76, 78. In contrast, the agreements in this case, which do not contain a definite term, specify the circumstances in which the agreements may be dissolved.

BPR argues that even if the joint ventures were not at will, there exists a genuine issue of material fact requiring an evidentiary hearing to determine whether the deterioration in Buonato and Bendetson's relationship warranted dissolution under G. L. c. 108A, § 32 (1) (f),[17] and the judge erred by granting summary judgment on this issue to the defendants.

At the outset, we note that the defendants do not claim that § 4 of the joint venture agreements precludes recourse to dissolution under § 32 (1) (f). See *Cooper* v. *Isaacs*, 448 F.2d 1202, 1206 (D.C. Cir. 1971) (partnership agreement specifying how partnership could be terminated did not foreclose possibility of dissolution under D.C.'s equivalent to § 32); *Imperial Litho/Graphics* v. *M.J. Enters.*, 152 Ariz. 68, 76 (Ct. App. 1986) (same under Arizona law).

We have not had occasion to consider when "[o]ther circumstances render a dissolution equitable." § 32 (1) (f). However, in *Ferrick* v. *Barry*, 320 Mass. 217, 222 (1946), we affirmed a decree of dissolution under § 32 (1) (d): "The conduct of [the defendant] had brought about a situation in which the business could no longer be carried on jointly in the manner contemplated by the articles of co-partnership. The other partners were not required to submit to [the defendant's] domination or to continue in an atmosphere of non-cooperation, suspicion, and distrust, even though [the plaintiff] was not actually dishonest, and even though substantial profits were being made." Many of the considerations rendering judicial dissolution of that partnership appropriate would apply to any case where dissension among partners seriously impairs the ability of the partners to conduct the partnership, see *Gerard* v. *Gateau*, 84 Ill. 121, 124-125 (1876); *Fooks* v. *Williams*, 120 Md. 436, 441 (1913); *Singer* v. *Heller*, 40 Wis. 544, 547 (1876); and are applied by other courts in the context of statutory provisions similar to § 32 (1) (f).[18] See *Karber*

---

[17]The defendants argue that BPR is estopped from asserting that conflict and discord warranted dissolution under § 32 (1) (f) because BPR asserted below that Buonato's "lost confidence" in Bendetson made equitable dissolution appropriate. This contention lacks merit. Rather than making a bald assertion that he lacked confidence in Bendetson, Buonato's deposition testimony (which was before the judge at summary judgment) indicates that Buonato's lack of confidence in Bendetson originated in the discord and conflict between them.

[18]BPR has not sought dissolution under § 32 (1) (d), based on any mis-

v. *Karber*, 145 Ariz. 293, 295 (Ct. App. 1984); *Mayhew* v. *Mc-Glothlin*, 269 Ky. 184, 186 (1937); *Tiger, Inc.* v. *Fisher Agro, Inc.*, 301 S.C. 229, 238-239 (1989); H.J. Alperin, Summary of Basic Law § 14.32, at 73 (2008). See also 48A C.J.S. Joint Ventures § 20, at 340-341 (2004). Neither a partner's curmudgeonly disposition, see *Gerard* v. *Gateau, supra* at 124, nor a simple difference of opinion in business judgment, see *Potter* v. *Brown*, 328 Pa. 554, 561-562 (1938), normally will suffice to dissolve a partnership under § 32 (1) (*f*). Rather, § 32 (1) (*f*) requires that dissension among the partners be so serious, irreconcilable, and permanent that it would be inequitable to require them to continue as partners. H.J. Alperin, *supra* at § 14.32, at 74. A nonexhaustive list of considerations relevant to an application for dissolution under § 32 (1) (*f*) includes: (1) the extent of the dissension[19]; (2) the relative fault of the partners in creating and contributing to dissension[20]; (3) the profitability of the partnership

feasance by Bendetson per se; instead, it essentially claims that the relationship between its members and Bendetson is so strained they can no longer continue as partners.

[19]See *Bertolla* v. *Bill*, 774 So. 2d 497, 503 (Ala. 1999) (equitable dissolution proper where "[e]very witness who was asked whether [partners] could continue in partnership with each other answered that they could not. It is well settled that partners who cannot interact with each other should not have to remain bound together in partnership"); *Gerard* v. *Gateau*, 84 Ill. 121, 124 (1876) (no equitable dissolution for "trifling causes or temporary grievances," but appropriate if "[p]ermanent mischiefs . . . could only be avoided by a severance of the partnership relations"); *Kaluzny Bros.* v. *Mahoney Grease Serv., Inc.*, 165 Ill. App. 3d 390, 397 (1988) (equitable dissolution under Illinois equivalent of § 32 [1] appropriate where there were constant disputes, distrust, noncooperation, and deadlock in decision-making); *Fooks* v. *Williams*, 120 Md. 436, 441 (1913) (frequent petty bickering may destroy mutual confidence necessary to conduct partnership); *Schafer* v. *RMS Realty*, 138 Ohio App. 3d 244, 305 (2000) (no dissolution under Ohio equivalent of § 32 [1] [*f*] where, inter alia, partners were able to make decisions despite dissension); *Potter* v. *Brown*, 328 Pa. 554, 561-562 (1938) ("Equity is not a referee of partnership quarrels. A going and prosperous business will not be dissolved merely because of friction among the partners; it will not interfere to determine which contending faction is more at fault").

[20]See *Bates* v. *McTammany*, 10 Cal. 2d 697, 700 (1938) (no equitable dissolution where party seeking dissolution was at fault and dissolution would cause loss to partnership); *Gerard* v. *Gateau, supra* at 125 (partner inducing dissension should not benefit from his own belligerence to detriment of innocent partners); *Loomis* v. *McKenzie,* 31 Iowa 425, 427 (1871) (no equitable reason to set aside partnership agreement where nothing showed that discord resulted from fault of defendant); *Green* v. *Kubik*, 213 Iowa 763, 766 (1931)

notwithstanding partner dissension[21]; (4) the involvement of the partners in the day-to-day operations of the partnership[22]; and (5) whether dissolution would work a substantial financial detriment to the value of the partnership business.[23]

Viewing the facts in the light most favorable to BPR, see *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 539 (1995), we conclude that the judge should have denied the defendants' motion for partial summary judgment with respect to the counts of BPR's complaint seeking equitable dissolution. In addition to the disputes concerning Bendetson and Buonato's other business dealings, there is evidence that the relationship between Bendetson and Buonato had deteriorated to the point where they no longer could stand to be in a room with one another. By 2000, any confidence between them had been destroyed, and both desired to end their dealings with one another. Moreover, there was some evidence that Buonato monitored the condition of the joint venture properties and that Bendetson ignored Buonato's concerns about the maintenance and condition of the properties. Factors weighing against dissolution, including the financial success of the joint ventures and the fact that Carver and Drucker also would suffer any consequences resulting from dissolution even though they do not appear to have contributed significantly, if at all, to the acrimony between Buonato and Bendetson, also should be

(equitable dissolution appropriate where both parties contributed to discord); *Potter* v. *Brown*, *supra* at 562 (plaintiffs' exaggerations concerning technical misconduct of partner weighed against equitable dissolution).

[21]See *Schafer* v. *RMS Realty*, *supra* at 303 (partnership highly profitable despite dissension); *Potter* v. *Brown*, *supra* at 560 (business profitable despite partner's misconduct). Contrast *Ferrick* v. *Barry*, 320 Mass. 217, 222 (1946) (partner's conduct created situation in which partnership could not be conducted as contemplated by partnership agreement notwithstanding partnership's substantial profits).

[22]See *Gerard* v. *Gateau*, *supra* at 124 (ill will between partners unlikely to interfere with management of firm's affairs as partnership agreement gave defendant partner principal control of business's affairs); *Schafer* v. *RMS Realty*, *supra* at 305 (dissolution unwarranted where only responsibility of partners was to collect rent and minimal contact between partners was necessary to conduct partnership business).

[23]See *Bates* v. *McTammany*, *supra* at 699-700 (dissolution would diminish value of partnership significantly because partnership's most valuable asset, a Federal license to operate radio station, could not be sold at dissolution sale); *Schafer* v. *RMS Realty*, *supra* (dissolution would result in adverse tax consequences and loss of investment value to partners).

considered. The weight given to each factor and the balancing of the relative weight of each factor, however, should ordinarily be determined by a trier of fact. Given the breakdown in communication between Buonato and Bendetson, and Buonato's involvement in the affairs of the joint venture, we think a genuine issue of material fact exists as to whether dissension between BPR's members and Bendetson justified dissolution of the joint ventures under § 32 (1) (f).

(c) *Damages.* We address BPR's contentions concerning damages and prejudgment interest in the event that BPR does not prevail under § 32 (1) (f) on remand. The judge found that if the defendants elected to satisfy the plaintiff's judgment by refinancing two mortgaged properties belonging to the joint ventures, defeasance fees might be assessed against the joint ventures under the terms of the preexisting mortgages and the defendants would incur other costs related to refinancing. He made no specific findings concerning those expenses because they had not yet been incurred. The defendants' counsel subsequently submitted an affidavit from the mortgagee's attorney stating that the defeasance fees and refinancing costs totaled $352,103.72.[24]

On appeal BPR asserts that the judge erroneously ordered the deduction of the defeasance fees and costs of refinancing because the defendants voluntarily incurred those costs to satisfy the judgment. We disagree. A review of the mortgage documents[25]

---

[24]In one of BPR's motions to amend the judgment, BPR contended that the judge's reliance on the affidavit was "unfair" because his findings "were, in part, based on a cover letter from counsel unsupported by any admissible evidence." BPR asserted that the judge's reliance on the affidavit was particularly unfair because the savings resulting from refinancing would offset some of the defendants' damages. The judge subsequently credited an affidavit submitted by BPR stating that the joint ventures would save $40,260.32 as a result of the refinancing and reduced the defendants' damages accordingly.

BPR now maintains that it was denied an opportunity to cross-examine the affiant because no hearing concerning the defeasance fees and costs of refinancing was held. BPR asserts that cross-examination of the affiant was important because the affidavit did not describe the complex calculation used to ascertain the amount of the defeasance fees. The judge reduced the defendants' damages as requested by BPR. BPR does not appear to have requested an evidentiary hearing or raised this particular issue below. It is therefore waived. See *Century Fire & Marine Ins. Corp.* v. *Bank of New England-Bristol County, N.A.,* 405 Mass. 420, 421 n.2 (1989).

[25]Both mortgage agreements state that the commencement of dissolution

indicates that BPR's commencement of dissolution proceedings constituted a default on the mortgages, and thereby rendered the joint ventures liable for the payment of the balance of both mortgages and certain defeasance fees. See note 25, *supra.* To the extent BPR argues that the defaults could have gone unnoticed by the mortgagee had the defendants not refinanced the mortgages to satisfy the judgment, the simple fact is that dissolution of the joint ventures rendered the joint ventures liable for the balance of the mortgages as well as any defeasance fees.

(d) *Prejudgment interest.* BPR's contention that the judge erred in not awarding it prejudgment interest lacks merit. In *Anastos* v. *Sable,* 443 Mass. 146, 154 (2004), we held that nothing in G. L. c. 108A, § 38 or § 42, "provides interest on the buyout amount for the partner who caused a wrongful dissolution and who thereby departs the partnership." The fact that the judge here ordered the deduction of postdissolution distributions received by BPR from BPR's judgment does not alter our conclusion that nothing in G. L. c. 108A, § 38, entitles a partner who wrongfully dissolves a partnership to prejudgment interest.

BPR asserts that G. L. c. 108A, § 5,[26] authorizes an award of prejudgment interest. BPR has cited no authority for this proposition or otherwise argued that equitable circumstances warrant such an award. See, e.g., *Shulkin* v. *Shulkin,* 301 Mass. 184, 186-187 (1938) (award of interest equitable where two partners withdrew twice as much from business's account as third partner). It has therefore waived the issue. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). In any event, we seriously doubt that an award of prejudgment interest is appropriate where a partner or joint venturer has wrongfully dissolved a partnership. Cf. *Marchand* v. *Murray,* 27 Mass. App. Ct. 611, 616 (1989)

proceedings constitutes a default, and that on default, the joint venture becomes liable for payment of the balance of the mortgage, as well as "the applicable prepayment consideration specified in the Note." Only one of the mortgage notes has been included in the record on appeal. That note states that in the event of a default, the mortgagor may be required to pay the balance of the mortgage and "the Yield Maintenance Premium, if any, that would be required under the Defeasance Option." Given that the mortgage agreements appear to be identical, we assume that the terms of the notes also were identical.

[26]General Laws c. 108A, § 5, provides: "In any case not provided for in this chapter the rules of law and equity, including the law merchant, shall govern."

(equities not sufficiently compelling to warrant award of prejudgment interest to partner who breached partnership agreement).

3. *Conclusion.* For the foregoing reasons, we affirm so much of the judgment that ruled that BPR could not dissolve the joint ventures pursuant to G. L. c. 108A, § 31 (1) (*b*). We reverse so much of the judgment that dismissed the counts of BPR's complaint seeking decrees of dissolution under G. L. c. 108A, § 32 (1) (*f*), and remand that issue for further proceedings consistent with this opinion.

*So ordered.*

GANTS, J. (concurring in part). I concur in each of the court's conclusions but respectfully disagree with the court's reasons for reversing the judge's allowance of summary judgment against BPR Group Limited Partnership (BPR) as to the counts of BPR's complaint seeking equitable dissolution of the joint ventures under G. L. c. 108A, § 32 (1) (*f*). The court concludes that the judge's grant of summary judgment dismissing these counts was error because "a genuine issue of material fact exists as to whether dissension between BPR's members and [Richard] Bendetson justified dissolution of the joint ventures under § 32 (1) (*f*)." *Ante* at 869. If these counts were not equitable in nature, I would agree that the existence of a genuine issue of material fact would require the denial of summary judgment. Where, as here, the defendants have moved for summary judgment as to the plaintiff's equitable claims, however, the analysis must differ.

When a judge evaluates a claim for equitable relief, the judge does more than find the facts; he also must determine, based on those facts, whether equitable relief would be in the interests of justice. In considering a motion for summary judgment when material facts are in dispute, a judge appropriately may determine that, even viewing the facts in the light most favorable to the plaintiff, he still would not conclude that equitable relief was warranted in light of the balance of equities. In such a case, summary judgment would be appropriate despite the existence of disputed material facts, because even were the case to be tried and the plaintiff to establish in his favor all the contested factual

issues, equitable relief still would be denied. Indeed, if the judge has already reached that conclusion on summary judgment, a trial would be a needless waste of time and effort.

In the circumstances just described, a reviewing court would simply need to determine, based on the view of the evidence most favorable to the plaintiff, whether it was an abuse of discretion for the judge to have denied the equitable relief sought by the plaintiff. See *Demoulas* v. *Demoulas*, 428 Mass. 555, 589 (1998), and cases cited. There is nothing in the court's decision to suggest that, even viewing the evidence in the light most favorable to BPR, it would have constituted an abuse of discretion for the judge to have denied BPR the equitable relief it sought on summary judgment. Granting BPR the benefit of all disputed facts, there continue to be key undisputed facts that would militate against BPR's claim for equitable relief: the joint ventures had been profitable, only one of the four equal participants had lost confidence in Bendetson's management of the joint ventures, and, perhaps most importantly, the commencement of dissolution proceedings constituted a default on the joint ventures' mortgages, triggering substantial defeasance fees and refinancing costs.

I join in the court's decision to reverse the grant of summary judgment as to BPR's equitable claims only because it is not plain from the judge's decision that he considered the question of equitable relief in the factual light most favorable to BPR, and a remand to clarify this matter is not practicable in light of the judge's retirement from the bench. Without an explicit declaration by the judge that he viewed the evidence in the light most favorable to the plaintiff and still concluded that equitable relief would not be just or warranted, it would be inappropriate for this court to conclude that the judge had applied that analytical approach in allowing summary judgment.