FAHEY, J.
***278 A partnership is a voluntary, contractual association in which persons carry on a business for profit as co-owners. In the agreement establishing a partnership, the partners can chart ***279 their own course. New York's Partnership Law creates default provisions that fill gaps in partnership agreements, but where the agreement clearly states the means by which a partnership will dissolve, or other aspects of partnership dissolution, it is the agreement that governs the change in relations between partners and the future of the business. We hold that the partnership agreement in this case dictates the conclusion that defendant Marc A. Malfitano, a partner, wrongfully dissolved the partnership, but we conclude that it was error to include the legal fees incurred by the remaining partners in the damages owed to them by defendant. In other respects, we uphold the Appellate Division's valuation of defendant's interest in the partnership.
I.
In 1985, defendant and seven others entered into a written agreement (the agreement) to form a general partnership known as "Poughkeepsie Galleria Company" (the Partnership), for the ownership, operation, and management of a shopping mall. The mall opened in 1987 and continues to operate today. Defendant initially had a 2.25% ownership interest in the *344 **876 Partnership, which increased to 3.08% by the mid-2000s. In addition to the minority partners, the Partnership had a majority owner, Moselle Associates, which controlled a little over 56% of the Partnership.
The agreement provided that the Partnership "shall continue until it is terminated as hereinafter provided." In a subsequent provision, the agreement stated that the Partnership would dissolve upon "[t]he election by the Partners to dissolve the Partnership" or "[t]he happening of any event which makes it unlawful for the business of the Partnership to be carried on or for the Partners to carry it on in Partnership."
The agreement further stated that "[a]ll decisions to be made by the Partners shall be made by the casting of votes at a meeting of such Partners" and that "[t]he affirmative vote of no less than fifty-one percent (51%)" of the partners "shall be required to approve any matter presented for decision." Day-to-day control of the Partnership was vested in a three-member Executive Committee, comprised of Robert J. Congel, Bruce A. Kenan, and James A. Tuozzolo, the plaintiffs in this case. The Executive Committee had "the exclusive right to manage the business of the Partnership," although a majority of partners had the authority to "overrule or modify" the Committee's decisions, ***280 "withdraw or modify" any power granted to the Committee, or remove its members.
In the mid-2000s, defendant decided to withdraw from the Partnership. Defendant asserts that certain conduct by plaintiffs related to the Partnership troubled him, and that when he challenged plaintiffs, they did not address his concerns. He explored the option of a buyout of his interest, but negotiations failed.
On November 24, 2006, defendant wrote to his partners: "[I]n accordance with Section 62 (1) (b) of the Partnership Law, and as a general partner of the Partnership I hereby elect to dissolve the Partnership and by this notice the Partnership is hereby dissolved."
Partnership Law § 62 (1) (b) states that a partner may unilaterally dissolve a partnership, without violating the partnership agreement, if "no definite term or particular undertaking is specified" in the agreement and the partnership is therefore "at will." Defendant insisted that his partners were compelled to liquidate. The Partnership was in the process of negotiating a mortgage refinancing, and defendant recorded a notice of pendency on the Poughkeepsie Galleria property.
The partners took the position that defendant had wrongfully dissolved the Partnership,[1] and they continued the business, in the same name as before, pursuant to Partnership Law § 69 (2) (b). That provision states, with certain conditions, that when dissolution is caused in violation of a partnership agreement, "[t]he partners who have not caused the dissolution wrongfully, if they all desire to continue the business in the same name ... may do so, during the agreed term for the partnership and for that purpose may possess the partnership property."
In January 2007, plaintiffs, as the Partnership's Executive Committee and on behalf of the Partnership, commenced this breach of contract action, seeking a declaratory **877 *345 ruling that defendant had wrongfully dissolved the Partnership, as well as damages. Plaintiffs also moved for an order canceling the notice ***281 of pendency. It was only after the lawsuit was commenced that a mortgage lender was willing to proceed with refinancing of the mall.
Defendant answered and interposed several counterclaims, including the allegation that the dissolution precluded the Partnership from refinancing or taking any business actions other than winding up, and a claim for judicial dissolution under Partnership Law § 63 (1).[2] Defendant also cross-moved to dismiss the complaint under CPLR 3211 (a) (7) for failure to state a cause of action, insisting that the Partnership qualified as an "at-will" partnership, which can be dissolved without violation of the partnership agreement, under Partnership Law § 62 (1) (b).
After Supreme Court denied defendant's cross motion to dismiss and canceled the notice of pendency, plaintiffs moved for summary judgment on their wrongful dissolution and breach of contract claims, asserting that the agreement provided for only two methods whereby the Partnership would dissolve without violation of the agreement, and that defendant's unilateral dissolution breached the agreement. Defendant cross-moved for summary judgment.
Supreme Court granted summary judgment to plaintiffs, holding that the Partnership was not an "at-will" partnership, because it specified a "particular undertaking" within the meaning of Partnership Law § 62 (1) (b), and that defendant's dissolution of the Partnership breached the agreement. Supreme Court dismissed defendant's counterclaims, including his claim for judicial dissolution, and denied his cross motion for summary judgment.
In April 2009, the Appellate Division upheld Supreme Court's ruling on the wrongfulness of the dissolution, albeit on different grounds, finding that the agreement specified a "definite term" or temporal limit under Partnership Law § 62 (1) (b) ( 61 A.D.3d 807, 808-809, 877 N.Y.S.2d 443 [2d Dept. 2009] ). In a separate order issued on the same date, the Appellate Division affirmed Supreme Court's order granting summary judgment to plaintiffs, holding that plaintiffs had satisfied their prima facie burden of ***282 showing that defendant had dissolved the Partnership in contravention of the agreement, and that defendant had failed to raise a triable issue of fact ( 61 A.D.3d 810, 811, 877 N.Y.S.2d 441 [2d Dept. 2009] ). The Appellate Division also affirmed dismissal of defendant's counterclaims, including his judicial dissolution claim ( 61 A.D.3d at 812, 877 N.Y.S.2d 441 ). The Appellate Division remitted for further proceedings on, among other things, the issue of damages for breach of contract ( id. ).
On remittal in Supreme Court, defendant moved for partial summary judgment, seeking a declaration that plaintiffs were not entitled to attorneys' fees related to their lawsuit. In response, plaintiffs contended that they were entitled to fees on any actions they were compelled to take so as to avoid liquidation. They sought $2,717,314.50 in attorneys' fees and $79,705.50 in experts' fees.
Supreme Court ruled that plaintiffs were entitled to attorneys' fees and experts' fees, as part of their damages, reasoning **878 *346 that those costs "are not incidental to the litigation" but instead are "damages caused by the defendant's breach" of the agreement. However, Supreme Court did not award the full amount of attorneys' fees sought, awarding $1,516,452 in attorneys' fees, as well as experts' fees in the requested amount.
Partnership Law § 69 (2) (c) (II) states that when a partner dissolves a partnership in contravention of the partnership agreement, and the remaining partners continue the business in the same name, the dissolving partner has
"the right as against his copartners ... to have the value of his interest in the partnership, less any damages caused to his copartners by the dissolution, ascertained and paid to him in cash, or the payment secured by bond approved by the court, and to be released from all existing liabilities of the partnership; but in ascertaining the value of the partner's interest the value of the good-will of the business shall not be considered."
Consequently, in November 2011, Supreme Court conducted a bench trial to establish the value of defendant's interest in the Partnership, taking into account the value of goodwill, and the amount of damages, if any, that defendant owed to plaintiffs. At the outset of trial, the parties stipulated that the value of defendant's interest in the Partnership as of November 24, 2006 was $4,850,000.
***283 Both parties offered expert witness testimony on the applicability and amounts of certain deductions in value, including whether the stipulated value of defendant's interest in the Partnership included a component of goodwill, for which a deduction would be required under Partnership Law § 69 (2) (c) (II), and whether defendant's interest should be reduced to account for lack of marketability, in light of the absence of a readily available market to sell the partnership interest, and to account for his status as a minority partner.
Plaintiffs' valuation expert testified that the value of the Partnership contained goodwill of 44%, by which amount the value of defendant's interest should be proportionately reduced, and that his interest should be further reduced by, successively, a marketability discount of 35% and a minority discount of 66%. In testifying that a minority discount was applicable, based upon defendant's lack of control in the Partnership, the expert witness emphasized what he described as "draconian" restrictions on transferability under the agreement, and in particular a provision, which the expert testified he had never before seen in his 40-year career, that if a partner sold his or her interest, then for five years after the date of sale, the partner would be jointly and severally liable, with the buyer, for any capital costs. The expert testified that this restriction was relevant not only to the marketability of defendant's interest, but also to the minority status of the interest, in that a minority owner has no say in whether there would be a capital call.
Defendant's valuation expert testified that the Partnership-as a real estate holding company-did not have goodwill, but conceded that he did not regularly value assets of that type. The expert witness further testified that he had been "advised, under the relevant statutes, that a minority discount was not applicable," adding that while a minority discount "would be applicable" if the court were determining "fair market value," it did not apply when determining "fair value." Because of this "advice," the expert witness did not argue, in the alternative, that the amount of the minority discount proposed by plaintiffs' expert, i.e., 66%, was unreasonable or in error.
*347 **879 Conversely, defendant's expert did not contest that a marketability discount would apply, but valued it at 25%, rather than 35%. Notably, in posttrial papers, defendant failed to preserve any general objection to the marketability discount as legally inapplicable, focusing instead on the amount of that discount.
***284 A second plaintiffs' witness testified about plaintiffs' legal fees, insisting that the fees had been incurred as a direct result of defendant's wrongful dissolution, including time and labor required to prevent the consequences that would have ensued if the dissolution had not been deemed wrongful. Defendant himself testified, and challenged the inclusion of plaintiffs' legal fees as damages.
Supreme Court ruled that the stipulated value of $4,850,000 would be reduced by 15% or $727,500 to represent the value of the Partnership's goodwill. The trial court reasoned "that the partnership does indeed possess goodwill of its own," because the mall "and its tenants attract regular, loyal shoppers, which point towards the existence of some goodwill." The trial court explained that "[a] potential purchaser of the Poughkeepsie Galleria would more than likely pay more for an established going concern that already has tenant retail stores that attract a loyal customer base," and in this manner "would pay extra for the acquisition of goodwill." However, the court disagreed with plaintiffs' figure of 44% for the goodwill deduction, and concluded that "the 'premium' a buyer would likely pay for goodwill under the facts of this case is 15%."
Next, Supreme Court applied a 35% or $1,442,875 marketability discount, to the stipulated value as reduced by goodwill, to account for the limited marketability of defendant's interest, generating a discounted value of $2,679,625. The trial court explained that it had taken into consideration all factors inhibiting transfer of defendant's partnership interest "resulting from a limited market." However, the trial court declined to apply a minority discount, citing cases that have barred the use of a minority discount in evaluation of a minority shareholder's stock in a closely held corporation.
Finally, Supreme Court ruled that defendant owed damages in the amount of $1,516,452 in plaintiffs' attorneys' fees and $79,705.50 in plaintiffs' experts' fees. The trial court reasoned that the Partnership was required "to incur enormous legal fees" to avoid the "devastating consequence" of a forced liquidation, and wrote that, although "[b]oth parties contributed to the litigious nature of this case," defendant was "clearly much more responsible than the plaintiffs."
The net result was a judgment in favor of defendant and against plaintiffs in the amount of $1,083,467.50, to be reduced ***285 by prejudgment interest of 9% in favor of plaintiffs on the fees award.[3] Defendant appealed, and plaintiffs cross-appealed.
Defendant contended, among other things, that the Appellate Division should overturn its 2009 rulings holding that he had wrongfully dissolved the Partnership, in light of this Court's decision in Gelman v. Buehler, 20 N.Y.3d 534, 964 N.Y.S.2d 80, 986 N.E.2d 914 (2013), which provides a detailed analysis of the nature of an "at-will" partnership.[4] For their part, plaintiffs *348 **880 contended, among other things, that a minority discount should have been applied to the valuation of defendant's interest in the Partnership.
In May 2016, the Appellate Division modified Supreme Court's judgment, by deleting the provision in favor of defendant and against plaintiffs, affirmed as modified, and remitted to the trial court for a new calculation incorporating a 66% minority discount, applied to the discounted value of defendant's interest in the partnership, and for entry of a new judgment ( 141 A.D.3d 64, 76, 32 N.Y.S.3d 264 [2d Dept. 2016] ).
The Appellate Division adhered to its earlier determination that defendant had wrongfully dissolved the Partnership, noting that
"[t]he facts of Gelman, involving an alleged oral partnership agreement which lacked a definite term of duration, are plainly distinguishable from the facts of this case. In contrast to Gelman, the written partnership agreement here specified that the partnership would continue until terminated by a majority vote of the partners, and was thus not dissolvable at will by a single partner" (141 A.D.3d at 70, 32 N.Y.S.3d 264 [citation omitted] ).[5]
With respect to the minority discount, the Appellate Division distinguished ***286 Matter of Friedman v. Beway Realty Corp., 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972 (1995), because that case involved the determination of the "fair value" of stock held by a dissenting shareholder under the Business Corporation Law, whereas "this case ... involves the determination of the 'value' of the shares of a partner who has wrongfully caused the dissolution of a partnership pursuant to Partnership Law § 69 (2) (c) (II)" (141 A.D.3d at 73, 32 N.Y.S.3d 264). The Appellate Division relied instead on Anastos v. Sable, 443 Mass. 146, 819 N.E.2d 587 (2004), in which the Massachusetts Supreme Judicial Court analyzed that state's equivalent of the New York Partnership Law provisions implicated here.
"Here, as in Anastos, the partnership remains a going concern, and the defendant has no right to compel a liquidation sale of the partnership's shopping mall and receive a proportionate share of the liquidation value of that asset. Under these circumstances, a minority discount may properly be applied to account for the defendant's lack of control in the partnership as a going concern." (141 A.D.3d at 74-75, 32 N.Y.S.3d 264.)
With regard to the goodwill discount, the Appellate Division held that the evidence at trial supported Supreme Court's determination that the Partnership "had goodwill in connection with the operation of the shopping mall that it owned" (141 A.D.3d at 75, 32 N.Y.S.3d 264). The Appellate Division found the plaintiffs' expert's testimony that a 66% minority discount was appropriate to be credible and supported by the record ( id. ), and summarily rejected defendant's challenge to the marketability discount ( id. ). On the subject of attorneys' fees, the Appellate Division held *349 **881 that "the reasonable amount of certain legal expenses incurred by the plaintiffs" constituted "recoverable expenditures directly occasioned and made necessary by the defendant's breach of the partnership agreement, and were thus properly included as damages" ( id. ).
Upon remand, Supreme Court issued an amended judgment applying the minority discount and further reducing defendant's interest in the Partnership to $911,072.50; ruling that the plaintiffs were entitled to $1,822,460.25 in fees and statutory interest; and concluding that defendant owed plaintiffs $911,387.75.
We granted defendant leave to appeal, pursuant to CPLR 5602 (a) (1) (ii), from Supreme Court's amended judgment ***287 (28 N.Y.3d 1129, 45 N.Y.S.3d 369, 68 N.E.3d 97 [2017] ). The appeal brings up for review the Appellate Division's 2009 and 2016 orders.
II.
The first issue, as framed by the parties, is whether defendant's unilateral dissolution of the Partnership violated the agreement. The trial court and the Appellate Division both ruled that the dissolution was wrongful, but focused on whether the agreement specified a "definite term" or "particular undertaking" under Partnership Law § 62 (1) (b). Defendant contends that the Partnership was "at will" because the agreement did not contain a "definite term" or "particular undertaking" under the statute. Plaintiffs urge us to affirm on an alternative ground, namely that because the agreement sets out the methods of dissolving the Partnership in accordance with the agreement, the wrongfulness of defendant's dissolution can be decided without recourse to the statute. We agree with plaintiffs on this issue.
The governing law of partnerships in New York is the Partnership Law of 1919, which enacted into law the original Uniform Partnership Act (UPA). It is well established, however, that "[t]he Partnership Law's provisions are, for the most part, default requirements that come into play in the absence of an agreement" ( Ederer v. Gursky, 9 N.Y.3d 514, 526, 851 N.Y.S.2d 108, 881 N.E.2d 204 [2007] ). The statutory scheme
"applies only when there is either no partnership agreement governing the partnership's affairs, the agreement is silent on a particular point, or the agreement contains provisions contrary to law. Where an agreement addresses a particular issue, the terms of the agreement control, and the rights and obligations of the parties are determined by reference to principles of contract law. Thus, an agreement specifying the circumstances under which a partnership may be dissolved is not at will." ( BPR Group Ltd. Partnership v. Bendetson, 453 Mass. 853, 863-864, 906 N.E.2d 956 [2009] [internal quotation marks and citations omitted]; accord e. g.Matter of Popkin & Stern, 340 F.3d 709, 714 [8th Cir. 2003] ).
Indeed, partners may, "absent prohibitory provisions of the statutes or of rules of the common law relating to partnerships, or considerations of public policy, ... include in the partnership ***288 articles any agreement" the partners desire to include ( Cohen v. Lord, Day & Lord, 75 N.Y.2d 95, 102-03, 551 N.Y.S.2d 157, 550 N.E.2d 410 [1989] [internal quotation marks omitted] ). "[T]he partners of either a general or limited partnership, as between themselves, may include in the partnership articles any agreement they wish concerning the sharing of profits and losses, priorities of distribution on winding up of the partnership affairs and other matters. If complete, as between the partners, the agreement so *350 **882 made controls" ( Lanier v. Bowdoin, 282 N.Y. 32, 38, 24 N.E.2d 732 [1939] ).
In short, parties to a partnership agreement generally have the right to contract around a provision of the Partnership Law, provided of course they do so in language that is "clear, unequivocal and unambiguous" ( Springsteen v. Samson, 32 N.Y. 703, 706 [1865] ; see generally Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 [2004] ). No particular magic words need be recited, provided that the parties' intent is clear. With these principles in mind, we now summarize the Partnership Law provisions relied on by the lower courts, in order to assess whether they come into play or whether the agreement controls.
The Partnership Law provides that dissolution does not violate a partnership agreement if it occurs "[b]y the termination of the definite term or particular undertaking specified in the agreement" ( Partnership Law § 62 [1 ] [a] ). For example, if a partnership agreement provides that the agreement will terminate on a certain date, then the dissolution of the partnership on that date will be in accordance with the agreement. Moreover, if "no definite term or particular undertaking is specified" in the partnership agreement, then the partnership is said to be an "at-will" partnership, and a unilateral dissolution "[b]y the express will of any partner" does not violate the partnership agreement ( Partnership Law § 62 [1 ] [b] ). "[W]hen a partnership has no definite term or particular objective to be achieved, it may be dissolved at any time by the express will of one or more of the partners" ( Harshman v. Pantaleoni, 294 A.D.2d 687, 741 N.Y.S.2d 348 [3d Dept. 2002] ).
By contrast, the Partnership Law provides that a partnership is dissolved "[i]n contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time" ( Partnership Law § 62 [2 ] ). In other words, "[w]hen the agreement specifies a durational term, or a defined project, an attempt unilaterally to dissolve the ***289 partnership would violate the partnership agreement" ( Scholastic, Inc. v. Harris, 259 F.3d 73, 85 [2d Cir. 2001] ). While "partners are statutorily empowered to dissolve the partnership at any time, wrongfully dissolving partners may be liable to the expelled partner for breach of the partnership agreement" ( Dawson v. White & Case, 88 N.Y.2d 666, 670 n. 1, 649 N.Y.S.2d 364, 672 N.E.2d 589 [1996] [citation omitted]; accord Napoli v. Domnitch, 18 A.D.2d 707, 708, 236 N.Y.S.2d 549 [2d Dept. 1962], affd 14 N.Y.2d 508, 248 N.Y.S.2d 228, 197 N.E.2d 623 [1964] ).
Partnership Law § 62 (1) (b) codifies common-law doctrine that "a contract of partnership, containing no stipulation as to the time during which it shall continue in force ... may be dissolved by either partner at his own will, at any time" ( Karrick v. Hannaman, 168 U.S. 328, 333-334, 18 S.Ct. 135, 42 L.Ed. 484 [1897] ), unless the "partnership has for its object the completion of a specified piece of work, or the effecting of a specified result" ( Hardin v. Robinson, 178 App.Div. 724, 729, 162 N.Y.S. 531 [1st Dept. 1916] ; see Gelman, 20 N.Y.3d at 537, 964 N.Y.S.2d 80, 986 N.E.2d 914 ).
Here, the agreement stated that the Partnership "shall continue until it is terminated as hereinafter provided," and, in a subsequent provision, stated that the Partnership would dissolve upon "[t]he election by the Partners to dissolve the Partnership" or "[t]he happening of any event which makes it unlawful for the business **883 *351 of the Partnership to be carried on or for the Partners to carry it on in Partnership." The partners clearly intended that the methods provided in the agreement for dissolution were the only methods whereby the partnership would dissolve in accordance with the agreement, and by implication that unilateral dissolution would breach the agreement. In other words, the agreement contemplated dissolution only in two instances, leaving no room for other means of dissolution that would be in accordance with its terms.[6]
It follows that Partnership Law § 62 (1) (b) has no application here, because the parties to the agreement clearly specified under what terms it could be properly dissolved, i.e., what would constitute a dissolution under the agreement and what would constitute a dissolution in contravention of it. Accordingly, this was plainly not intended to be an "at-will" partnership.
***290 Gelman, therefore, does not apply. In that case, which involved an oral partnership agreement, with "a flexible temporal framework" and a "sequence of anticipated partnership events" that we described as "amorphous" ( Gelman, 20 N.Y.3d at 538, 964 N.Y.S.2d 80, 986 N.E.2d 914 ), we applied the Partnership Law to conclude that the omission of an identifiable termination date and of a particular undertaking rendered the partnership "at will." We did so of necessity. An oral agreement generally does not "set forth the circumstances under which the partnership could be dissolved without breaching the partnership agreement" ( BPR Group Ltd. Partnership, 453 Mass. at 864 n. 15, 906 N.E.2d 956 ). Here, by contrast, we are not required to apply the pertinent Partnership Law provisions to determine whether the dissolution breached the agreement. The breach is clear from the agreement alone.[7]
Although the lower courts erred in applying Partnership Law § 62 (1) (b) to decide whether defendant violated the agreement, the conclusion they reached, i.e., that defendant's dissolution was wrongful, is correct.
III.
Plaintiffs contend that they are entitled to attorneys' and experts' fees, as part of their damages under Partnership Law § 69 (2) (a) (II). Defendant insists that, even assuming that this Court rules against him on the question of breach, he should not be required to pay plaintiffs' attorneys' or experts' fees. On this issue, we agree with defendant.
Under Partnership Law § 69 (2) (a) (II), "[w]hen dissolution is caused in contravention of the partnership agreement ... [e]ach partner who has not caused dissolution wrongfully shall have ... [t]he right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement." The lower courts in this case held that the damages owed by defendant to plaintiffs include fees.
We conclude, however, that to award fees to plaintiffs would be to contradict New York's well-established adoption *352 **884 of the American Rule that "the prevailing litigant ordinarily cannot collect ... attorneys' fees from its unsuccessful opponents" ***291 ( Hunt v. Sharp, 85 N.Y.2d 883, 885, 626 N.Y.S.2d 57, 649 N.E.2d 1201 [1995] ). Contrary to Supreme Court, the standard is not which party was "more responsible" for the litigation. Attorneys' fees are treated as "incidents of litigation" ( Matter of A.G. Ship Maintenance Corp. v. Lezak, 69 N.Y.2d 1, 5, 511 N.Y.S.2d 216, 503 N.E.2d 681 [1986] ), rather than damages. "In contrast with other legal systems, such as that in Great Britain, it has now long been the universal rule in this country not to allow a litigant to recover damages for the amounts expended in the successful prosecution or defense of its rights" ( Mighty Midgets v. Centennial Ins. Co., 47 N.Y.2d 12, 21-22, 416 N.Y.S.2d 559, 389 N.E.2d 1080 [1979] ). The exception is when "an award is authorized by agreement between the parties or by statute or court rule" ( Mount Vernon City School Dist. v. Nova Cas. Co., 19 N.Y.3d 28, 39, 945 N.Y.S.2d 202, 968 N.E.2d 439 [2012], quoting A.G. Ship Maintenance Corp., 69 N.Y.2d at 5, 511 N.Y.S.2d 216, 503 N.E.2d 681 ), but plaintiffs point to no provision within the agreement or the Partnership Law authorizing such an exception to the American Rule here. In particular, plaintiffs fail to identify any counterpart in the Partnership Law to statutes such as CPLR 909, allowing recovery of attorneys' fees in class action lawsuits, or CPLR 5031, allowing recovery of attorneys' fees in medical malpractice actions.
Plaintiffs principally rely on City of Elmira v. Larry Walter, Inc., 150 A.D.2d 129, 133, 546 N.Y.S.2d 183 [3d Dept. 1989], affd 76 N.Y.2d 912, 563 N.Y.S.2d 45, 564 N.E.2d 655 [1990] ) and Aero Garage Corp. v. Hirschfeld, 185 A.D.2d 775, 776, 586 N.Y.S.2d 611 (1st Dept. 1992). In City of Elmira, the Appellate Division held that certain legal expenses incurred by the winning party in a breach of contract case were recoverable because the charges were not "counsel fees" subject to the American Rule, but rather "recoverable expenditures directly occasioned and made necessary by the breach" ( City of Elmira, 150 A.D.2d at 133, 546 N.Y.S.2d 183 [internal quotation marks and citations omitted] ). The expenses were legal fees expended in rebidding the contract following the breach, not in the breach of contract action itself. Similarly, in Aero Garage, the Appellate Division, citing City of Elmira, ruled that the trial court correctly "awarded attorney's fees incurred by plaintiff in obtaining [a] certificate of occupancy as an element of compensatory damages," because "[t]hese legal expenses were incurred by plaintiff in attempting by itself to fulfill defendants' obligations under the contract and were directly occasioned and made necessary by defendants' breach" ( Aero Garage, 185 A.D.2d at 776, 586 N.Y.S.2d 611 [internal quotation marks and citations omitted] ).
Rather than supporting plaintiffs' analysis, the cited cases clearly rely on a distinction between, on the one hand, legal ***292 fees incurred in prosecuting or defending a successful civil lawsuit and, on the other hand, legal fees, in the nature of damages, incurred in carrying out separate acts necessitated by the breach. Plaintiffs' approach would mean that fees could be awarded to the victorious party in any breach of contract litigation, as long as that party persuaded a court that it had to litigate the issue in order to avoid the consequences of defendant's breach. Indeed, this purported exception would be so large as to swallow the American Rule.
The lower courts erred in awarding attorneys' fees and experts' fees to plaintiffs, with respect to plaintiffs' lawsuit. To this extent, we modify the amended *353 **885 judgment of Supreme Court from which defendant appeals, as well as the Appellate Division's 2016 order upholding the award of fees, and we remit to Supreme Court for recalculation of damages. Plaintiffs, if they so choose, may argue on remand that certain attorneys' fees, not related to their lawsuit, were incurred as a direct result of defendant's breach and should be included as damages.[8]
IV.
With respect to the reduction for goodwill, Partnership Law § 69 (2) (c) (II) gives a partner who dissolves a partnership in contravention of the partnership agreement the right "to have the value of his interest in the partnership, less any damages caused to his copartners by the dissolution, ascertained and paid to him in cash, ... but in ascertaining the value of the partner's interest the value of the good-will of the business shall not be considered." In other words, any goodwill component in the value of the partner's interest must be deducted. Defendant argues that he should not have been assessed a goodwill deduction.
Goodwill is an intangible asset of a business, corresponding in this context to what a buyer would pay for the business, over and above its value as a mere sum of tangible assets, ***293 because of the patronage and support of regular customers. Goodwill consists in "every positive advantage... that has been acquired by a proprietor in carrying on [a] business, whether connected with the premises in which the business is conducted, or with the name under which it is managed, or with any other matter carrying with it the benefit of the business" ( Spaulding v. Benenati, 57 N.Y.2d 418, 424 n 3, 456 N.Y.S.2d 733, 442 N.E.2d 1244 [1982] [internal quotation marks and citation omitted] ). It is, in Judge Cardozo's words, what people "will pay for any privilege that gives a reasonable expectancy of preference in the race of competition. Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers" ( Matter of Brown, 242 N.Y. 1, 6, 150 N.E. 581 [1926] [citation omitted]; see also Spaulding, 57 N.Y.2d at 423, 456 N.Y.S.2d 733, 442 N.E.2d 1244 ).
Defendant argues that the Partnership lacked goodwill as a matter of law. He contends that goodwill does not exist in a real estate holding, citing Cohen v. Cohen, 279 A.D.2d 599, 719 N.Y.S.2d 700 [2d Dept. 2001] ) and Matter of Cinque v. Largo Enters. of Suffolk County, 212 A.D.2d 608, 622 N.Y.S.2d 735 [2d Dept. 1995] ) for the proposition that when holdings consist solely of real property and cash, no part of the value of the business is attributable to goodwill. Defendant misreads these cases. They do not hold that real estate holdings can never have goodwill value as a matter of law, but merely assert in each case that the subject real estate holding did not have a goodwill component as a matter of fact (see Cohen, 279 A.D.2d at 600, 719 N.Y.S.2d 700 ; Cinque, 212 A.D.2d at 610, 622 N.Y.S.2d 735 ).
Defendant also notes that no goodwill value was reflected in the books or financial statements of the Partnership. Lack of goodwill does not follow as a matter of law, however, from this circumstance. While defendant **886 *354 urges the Court to find an implied "agreement among partners ... that goodwill not be considered an asset of the firm" ( Dawson, 88 N.Y.2d at 671, 649 N.Y.S.2d 364, 672 N.E.2d 589 ), the precedent he relies on is clearly distinguishable. In Dawson, the partnership agreement of a law firm expressly provided that "no consideration has been or is to be paid for the Firm name or any good will of the partnership, as such items are deemed to be of no value" ( Dawson, 88 N.Y.2d at 672, 649 N.Y.S.2d 364, 672 N.E.2d 589 ), a contractual provision not present here. Indeed, Dawson clarified that its holding was "based on the specific facts presented, and should not be construed as a prohibition against the valuation, in the appropriate case, of ... goodwill" ( Dawson, 88 N.Y.2d at 672, 649 N.Y.S.2d 364, 672 N.E.2d 589 ).
In short, the goodwill question is a factual one. "In a case such as this, with affirmed findings of fact, our scope of review ***294 is narrow. This Court is without power to review findings of fact if such findings are supported by evidence in the record" ( Humphrey v. State of New York, 60 N.Y.2d 742, 743, 469 N.Y.S.2d 661, 457 N.E.2d 767 [1983] ). Here, the trial court found, based on the expert testimony and other evidence, that the shopping mall and the mall's tenants attract regular, loyal shoppers, and there is record support for the affirmed finding that the value of the Partnership included, in addition to its real property and cash, a goodwill component.[9]
V.
The next issue is whether the lower courts erred in applying a discount for lack of marketability, i.e., a deduction from the value of defendant's ownership interest reflecting the relative illiquidity or deficit in marketability of the interest. Defendant urges this Court to adopt the holding of the Louisiana Supreme Court that such "discounts must be used sparingly and only when the facts support their use" ( Cannon v. Bertrand, 2 So.3d 393, 396 [La. 2009] ). Defendant, however, failed to preserve any challenge to the applicability of a marketability discount to the value of a partnership interest after wrongful dissolution. At trial, his expert conceded that a marketability discount would apply and defendant did not depart from this in his posttrial motion papers. The parties' dispute before the trial court was over the percentage. Because the broader issue was not preserved, the application of the marketability discount is not properly before us.
VI.
The final question we must resolve is whether a minority discount may be applied in the calculation of the value of a wrongfully dissolving partner's interest in a partnership, pursuant to Partnership Law § 69 (2) (c) (II), when the remaining partners continue the business under Partnership Law § 69 (2) (b). A minority discount is a standard tool in valuation of a financial interest, designed to reflect the fact that the price an investor is willing to pay for a minority ownership interest in a ***295 business, whether a corporation or a partnership, is less because the owner of a minority interest lacks control of the business. **887 [10] *355 Defendant contends that, as a matter of law, minority discounts are not applicable in the valuation of a minority partner's interest after the partner exits a business that remains a going concern. This issue is properly preserved, but we cannot agree with defendant on the merits.[11]
In requiring the minority discount, the Appellate Division relied on Anastos v. Sable, 443 Mass. 146, 819 N.E.2d 587, in which the Massachusetts Supreme Judicial Court interpreted a UPA-based statute that is identical in all relevant respects to our Partnership Law § 69 (2) (c) (II). There, the plaintiff dissolved a partnership in violation of the partnership agreement, and, as here, the other partners continued the partnership business, rather than liquidate. The trial court in Anastos, in determining the value of the plaintiff's interest, applied a minority discount to reflect that there was "no ready market for the purchase of an interest in a general partnership whose primary asset is real estate where the partnership agreement contains limitations and restrictions on the control that any minority owner can exercise" ( Anastos, 443 Mass. at 147-148, 819 N.E.2d 587 ). The Supreme Judicial Court of Massachusetts upheld this decision, stating:
"In this case, the remaining partners chose to exercise their statutory right to continue the partnership business for the remainder of the partnership term, so the partnership business is not 'winding up' and must therefore be treated as a going concern. Because the plaintiff cannot compel liquidation of the business at the point of dissolution, we read [ Massachusetts General Laws, chapter 108A, § 38 (2) (c) (II) ] as offering a nonliquidation based method of calculating the value of his partnership interest." ( Anastos, 443 Mass. at 152, 819 N.E.2d 587.)
***296 Here, similarly, Partnership Law § 69 (2) (c) (II) contemplates a valuation of a wrongfully dissolving partner's interest based on treating the partnership as a going concern, rather than an asset to be liquidated. In other words, the statute does not contemplate a valuation of the entire business as if it were being sold on the open market, but rather a determination of the fair market value of the wrongfully dissolving partner's interest as if that interest were being sold piecemeal and the rest of the business continuing as a going concern.[12] Given that the focus is on one partner's interest in a persisting concern, we agree with the Massachusetts high court that a minority discount is applicable, because a minority interest is worth less to anyone buying that interest alone.
Notably, New York, like Massachusetts, has not adopted the 1997 Uniform Partnership Act commonly known as RUPA. The dissent's discussion of RUPA and of cases from states that have adopted RUPA
*356 **888 does not illuminate the law in New York. In particular, while RUPA, "[b]y focusing on a top-down valuation keyed to a sale of all of the assets of the partnership, ...directs the analysis away from a valuation of the interests of a particular partner," so that "a minority discount is inappropriate" (dissenting op. at 302, 76 N.Y.S.3d at 892, 101 N.E.3d at 360 [internal quotation marks and citation omitted] ), we conclude that the same cannot be said of the UPA.
It is true, of course, that in the Partnership Law § 69 (2) (c) (II) context the wrongfully dissolving partner's interest may simply be absorbed by the remaining partners. In our view, this does not render the value generated by application of a minority discount an inaccurate valuation of the intrinsic worth of that partner's interest. To repeat, the exiting partner's interest may appropriately be valued in light of the fair market value of that minority interest given that the partner is departing and the partnership continuing.
As defendant observes, the closest this Court has come to examining the issue is Matter of Friedman, 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972 ). There, we held that the use of a minority discount should be rejected in the context of valuing the interests of dissenting shareholders in a closely held ***297 corporation. That context, however, is clearly distinguishable from ours. Friedman involved a proceeding under Business Corporation Law § 623, which gives "minority stockholders the right to withdraw from a corporation and be compensated for the value of their interests when the corporate majority takes significant action deemed inimical to the position of the minority" ( Friedman, 87 N.Y.2d at 167, 638 N.Y.S.2d 399, 661 N.E.2d 972 ). Business Corporation Law § 623 invokes a statutory term of art, "fair value," in requiring that a dissenting shareholder who exercises appraisal rights be paid the "fair value" of his or her shares ( Business Corporation Law § 623 [e] ), as opposed to their fair market value. The term "fair value" is not present in the statute under review here.
The terminological difference reflects an underlying difference in statutory scheme. As plaintiffs note, Business Corporation Law § 623 contemplates a significant change to a business that the majority of shareholders have adopted over the minority's dissent. The value of the corporation's stock will likely be very different from the value prior to dissent and appraisal. This provides the rationale for the statutory requirement that the dissenter be paid "fair value," as opposed to fair market value, as a remedial matter. By contrast, wrongful dissolution of a partnership may happen at any time, and valuation of a partner's interest occurs only if the remaining partners have agreed to continue their business as if nothing changed. Unlike shareholder dissent and appraisal, wrongful dissolution is not necessarily preceded by upheaval "inimical to the position of the minority" ( Friedman, 87 N.Y.2d at 167, 638 N.Y.S.2d 399, 661 N.E.2d 972 ), so trial courts need not substitute a "fair value" for the actual value a third party would pay. Indeed, here the upheaval took the form of an action by a minority partner inimical to the majority's interests.
In short, Friedman does not offer a rationale for rejecting the view that third-party market value is the compensation to which a wrongful dissolver is entitled, a view consistent with the use of a minority discount to capture any impact that a lack of control may have on that market price. While "[t]he application of minority discounts is a matter of some debate in close corporations" (Bromberg & Ribstein on Partnership [2017-2 Supp.], at 7:168, § 7.13 [B] [1], n 17), "courts usually allow *357 **889 the application of a minority discount" in determining the value of an interest in a partnership (id., at 7:167, § 7.13 [B] [1], n 17).
Defendant also draws our attention to a decision by the Maryland Court of Special Appeals, ***298 E. Park LP v. Larkin, 167 Md. App. 599, 893 A.2d 1219 (2006), cert denied 393 M.d. 243, 900 A.2d 749 (2006). In that case, partners withdrew from a limited partnership under a statute providing that a partner could do so without dissolution, and "receive, within a reasonable time after withdrawal, the fair value of the partner's partnership interest in the limited partnership as of the date of withdrawal, based on the partner's right to share in distributions from the limited partnership" (Md. Code Ann., Corps. & Ass'ns § 10-604 ). Again, as in Friedman, it is clear that a different statutory scheme, involving cashing out an interest for "fair value," was at work. By contrast, the statute we are analyzing relates to wrongful dissolution, rather than a statutory right to withdraw, and it makes no mention of "fair value." Of course, this is not to say that the assessed value should not be fair. The point is simply that the statutory scheme in the Partnership Law is consistent with the application of a fair market value assessment of the particular partnership interest, and the use of standard valuation tools including a minority discount.
In sum, defendant provides no basis for concluding that a minority discount is inapplicable as a matter of law to the valuation of the interest of a wrongfully dissolving partner when the remaining partners continue the partnership.[13] We note, finally, that the parties to a partnership agreement may contract out of application of a minority discount to the valuation of their interests, just as they may contract around statutory provisions. Defendant does not assert that the agreement precluded use of a minority discount in this manner.
VII.
For these reasons, Supreme Court properly determined the value of defendant's interest in the Partnership, but erred in awarding fees to plaintiffs as part of the statutory damages.
Accordingly, the judgment appealed from and the orders of the Appellate Division brought up for review should be modified, without costs, by remitting the case to Supreme Court, for further proceedings in accordance with this opinion, and, as so modified, affirmed.
FEINMAN, J. (dissenting in part).
I fully concur with the well-reasoned ***299 analyses in Parts I through v. of the majority opinion. I do not join Part VI, the majority's holding that the trial court was required to apply a minority discount to the value of a partner's interests under Partnership Law § 69 (2) (c) (II). Except for a brief discussion of Anastos v. Sable, 443 Mass. 146, 819 N.E.2d 587 [2004] ), a Massachusetts case that I believe is inapposite, the majority's analysis of the minority discount issue consists almost exclusively of distinguishing the extensive authority adverse to its position. It does not, however, advance an affirmative rationale explaining why respondents' proposed interpretation ought to prevail over appellant's.
The consequences of a dissolution, including the dissolving and non-dissolving *358 **890 partners' respective liabilities, are governed principally by the partnership agreement (see Ederer v. Gursky, 9 N.Y.3d 514, 526, 851 N.Y.S.2d 108, 881 N.E.2d 204 [2007] ; see also Seattle-First Nat. Bank v. Marshall, 31 Wash.App. 339, 345-47,641 P.2d 1194, 1198-99 [1982], review denied 97 Wash. 2d 1023, 1982 WL 226450 [Wash. Jun. 30, 1982] ). As the majority observes, where, as here, the agreement is silent as to the amount payable to a dissolving partner, we must look to the default rules contained in Partnership Law § 69.
Section 69 distinguishes between wrongful and non-wrongful dissolutions. If the partnership's dissolution was not wrongful, then "each partner ... may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners" ( Partnership Law § 69[1] ). In effect, "the withdrawing partner, unless otherwise agreed, has the right, upon dissolution, to compel the 'winding up' or liquidation of the company, and receive the value of [its] interest in the partnership" ( Estate of Watts v. C.I.R., 823 F.2d 483, 486 [11th Cir. 1987] [emphasis omitted] [construing substantially identical provisions of the Oregon Uniform Partnership Act] ). Where dissolution is wrongful and the partners do not elect to continue the existence of the partnership under § 69(2)(b), the result is the same, except that the wrongful dissolver's right to payment must be set off against "damages for breach of the agreement" ( Partnership Law § 69[2][a][I]-[II], [c][I] ). If the partnership is continued, however, the Partnership Law states only that the wrongful dissolver is entitled to "the value of [the partner's] interest in the partnership," excluding goodwill and set off against contractual damages ( id. § 69[2][c][II] ). Although this procedure results in a technical dissolution, its economic effect in most cases is that a partner is allowed ***300 to cash out of the partnership and withdraw at any time, subject to its obligation to compensate the remaining partners for any losses they incur as a result of the breach of the partnership agreement. In this context, whether the "value of [the partner's] interest in the partnership" is subject to a discount for that partner's lack of control is the issue now before us.
Here, the majority insists that the "value of [the partner's] interest in the partnership" could only mean "the price at which [the interest] would change hands between a willing buyer and a willing seller" "as if that interest were being sold piecemeal and the rest of the business continuing as a going concern" (majority op. at 296 and 296 n. 12, 76 N.Y.S.3d at 887 and 887 n. 12, 101 N.E.3d at 355 and 355 n. 12). But the majority does not explain why this is so. It may be true that, if we were to adhere to this definition, it would lead to the conclusion that minority partnership interests should be discounted for lack of control (see Estate of Andrews v. C.I.R., 79 T.C. 938, 951-956 [T.C. 1982], superseded on other grounds by statute as recognized in Estate of Jelke v. C.I.R., 507 F.3d 1317 [11th Cir. 2007], rehg and rehg en banc denied 277 Fed. Appx. 977 [11th Cir. 2008], cert denied 555 U.S. 826, 129 S.Ct. 168, 172 L.Ed.2d 43 [2008] ; see also Sandra K. Miller, Discounts and Buyoutsin Minority Investor LLC Valuation Disputes Involving Oppression or Divorce, 13 U Pa J Bus L 607, 612-614 [2011] [finding that the evidence "leads one to believe that the minority discount is a very real market phenomenon"] ). However, it is not clear that this is what the Legislature, or the drafters of the Uniform Partnership Act (1914) ("UPA"), meant by "value." The plain-meaning of the word "value" does not unambiguously point to fair market value, *359 **891 let alone to the majority's hypothesized condition of a willing buyer, a willing seller, and a "piecemeal" marketing of only one slice of the partnership (see BFP v. Resolution Trust Corp., 511 U.S. 531, 535-540, 114 S.Ct. 1757, 128 L.Ed.2d 556 [1994] [rejecting a construction of "reasonably equivalent value" under 11 USC § 548(a)(2) that would equate "value" with "fair market value"] ). As the Supreme Court explained in BFP, "market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very antithesis of forced-sale value" ( id. at 537, 114 S.Ct. 1757 ).[1] ***301 The UPA left it unclear how a wrongful dissolver's buyout price should be calculated or whether any discounts should be applied (see UPA § 38 [2][c][II]; Brian Tully, Comment, Determining the 'Fair Value' of a Withdrawing Partner's Partnership Interest: Exploring the Uncharted Alphabet Soup of Texas Partnership Law, 54 Baylor L Rev 927, 945-949 [2002] ). This ambiguity was explored during the process of drafting what would become the Uniform Partnership Act (1997) ("Revised Uniform Partnership Act" or "RUPA"), and attempts to arrive at an appropriate definition were made (see Allan Donn, Robert W. Hillman and Donald J. Weidner, The Revised Uniform Partnership Act § 701 Authors' Comment 2 [2017-2018 ed.] ). As the Reporters for the RUPA acknowledged:
"The UPA says little about the buyout of a partner. UPA section 38(2) provides that, if there is a wrongful dissolution, the partners who have not dissolved wrongfully may continue the business 'during the agreed term' if they unanimously agree to do so. To do so, they must 'secure the payment by the bond approved by the court, or pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, less any damages recoverable ... and in like manner indemnify him against all present or future partnership liabilities.' There is no further definition of the buyout in the statute and the case law leaves many uncertainties about how the UPA rules apply." (Donald J Weidner & John W Larson, The Revised Uniform Partnership Act: The Reporters' Overview, 49 Bus Law 1, 10-11 [1993] ).
The RUPA resolved this ambiguity by explicitly defining the "buyout price" of a withdrawing partner as "the amount that would have been distributable to the dissociating partner ... if, on the date of dissociation, the assets of the partnership ***302 were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern" ( RUPA § 701 [b] ).[2] In other words, a *360 **892 dissociating partner would be entitled to its proportionate share in the value of the business as a going concern, set off against contractual damages, but without an individualized inquiry into the marketability of its particular slice of the partnership. Consistent with this definition, the Official Comment stated that "[t]he notion of a minority discount in determining the buyout price is negated by valuing the business as a going concern" (id. § 701 [b] cmt). As one leading treatise on the RUPA explained, "[b]y focusing on a top-down valuation keyed to a sale of all of the assets of the partnership, [RUPA] directs the analysis away from a valuation of the interests of a particular partner. Because the valuation inquiry is not directed to the value of an individual interest, a minority discount is inappropriate" (Donn, supra, § 701 Authors' Comment 4).
Although New York has not adopted the RUPA, "[l]egislative inaction is a weak reed upon which to lean in determining legislative intent" ( Flanagan v. Mount Eden General Hospital, 24 N.Y.2d 427, 433, 301 N.Y.S.2d 23, 248 N.E.2d 871 [1969] ). By excluding minority discounts, it does not appear that the drafters of the RUPA necessarily intended a change in the computation of the buyout price. The only departures from the UPA specifically noted in the Official Comment are the exclusion of the goodwill discount and the elimination of a partner's right to elect profits in lieu of interest under UPA § 42 (see RUPA § 701 [b] cmt). A 1986 report by the American Bar Association's UPA Revision Subcommittee stated that it was "unlikely that a different measure [of value] was intended" between UPA §§ 38(2)(c)(II) and 38(1) -the amounts payable to wrongful and non-wrongful dissolvers, respectively-"and there is no reason for the terms to be different" (UPA Revision Subcommittee of the Committee on Partnerships and Unincorporated Business Organizations, Should the Uniform Partnership Act Be Revised?, 43 Bus Law 121, 174-175 and n 119 [1987], citing J Crane & A Bromberg, Law of Partnership 476 n 54 [1968] ). This would suggest that "value," under UPA § 38(2)(c)(II), means a ***303 pro rata share of the partnership's value as a whole. As another commentator opined, while it was "not clear that the [UPA] mandates a pro rata share," "a strong argument can be made that the 'default' valuation under the UPA should be pro rata" (see Larry E. Ribstein, A Statutory Approach to Partner Dissociation, 65 Wash U L Q 357, 383 n 85 [1987] ). As Professor Ribstein explains:
"Partnership interests, unlike corporate stock, are not normally freely transferable. Giving each partner a right to sell his interest back to the firm, depending on how the buyout price is determined and the transaction costs of exercising the put, serves as a substitute for the efficient market for corporate stock in containing exploitation. In fact, a buyout price that represents the partner's pro rata share of the partnership is a better counter to exploitation than an efficient market price because the pro rata price prevents the controlling faction from taking advantage of its own exploitive conduct by purchasing the minority's interest at a discount." ( id. at 382-383 [footnotes omitted] ).
Because this valuation would simply entitle the dissolving partner to its allocable share of the value of the partnership as a whole, it would be incompatible with a minority discount (see *361 **893 Vick v. Albert, 47 A.D.3d 482, 484, 849 N.Y.S.2d 250 [1st Dept. 2008], lv denied 10 N.Y.3d 707, 858 N.Y.S.2d 655, 888 N.E.2d 397 [2008] ; Weidner & Larson, 49 Bus Law at 11-12 ).
In the context of corporate appraisals and judicial dissolutions, minority discounts have been soundly rejected in New York and in the vast majority of jurisdictions across the country (see In re Dissolution of Penepent Corp., Inc., 96 N.Y.2d 186, 194, 726 N.Y.S.2d 345, 750 N.E.2d 47 [2001] ; Friedman v. Beway Realty Corp., 87 N.Y.2d 161, 167-170, 638 N.Y.S.2d 399, 661 N.E.2d 972 [1995] ; Raskin v. Walter Karl, Inc., 129 A.D.2d 642, 644, 514 N.Y.S.2d 120 [2d Dept. 1987] ; Brown v. Arp and Hammond Hardware Co., 2006 WY 107, ¶¶ 28-30, 141 P.3d 673, 683 [2006] [collecting cases]; Christopher Vaeth, Propriety of Applying Minority Discount to Value of Shares Purchased by Corporation or its Shareholders from Minority Shareholders, 13 A.L.R.5th 840 [1993] ). In most states, including New York, minority stockholders must receive their "proportionate interest in the going concern value of the corporation as a whole, that is, what a willing purchaser, in an arm's length transaction, would offer for the corporation as an operating business" ( Friedman, 87 N.Y.2d at 168, 638 N.Y.S.2d 399, 661 N.E.2d 972 [internal quotation marks omitted], quoting ***304 Matter of Pace Photographers [Rosen], 71 N.Y.2d 737, 748, 530 N.Y.S.2d 67, 525 N.E.2d 713 [1988] ; see Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144 [Del. 1989] ; American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.22[a] [1994] ). This valuation precludes a minority discount because "[a] minority discount would necessarily deprive minority shareholders of their proportionate interest in a going concern" ( Friedman, 87 N.Y.2d at 169, 638 N.Y.S.2d 399, 661 N.E.2d 972 ; Cavalier, 564 A.2d at 1145 ).
This wealth of corporate cases has produced a number of interlocking rationales for excluding minority discounts. Two primary rationales have emerged from the case law. First, many courts, including this one, have explained that the exclusion is partially motivated by a desire to deter unfair squeeze-outs and safeguard minority shareholders from oppression (see Friedman, 87 N.Y.2d at 169-170, 638 N.Y.S.2d 399, 661 N.E.2d 972 ; Shawnee Telecom Resources, Inc. v. Brown, 354 S.W.3d 542, 552-556 [Ky. 2011] ; In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997, 1004-1005 [Me. 1989] ; Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 400-401, 734 A.2d 738, 748-749 [1999] ). The majority may be correct that these concerns are attenuated in the partnership context; a wrongful dissolution happens at the dissolving partner's initiative and is not necessarily triggered by a sale of the business or a determination that the partnership engaged in misconduct (cf. Business Corporation Law §§ 623, 1104-a ; Hansen v. 75 Ranch Co., 288 Mont. 310, 325, 957 P.2d 32, 41 [Mont. 1998] ["(D)iscounts at the shareholder level are inherently unfair to the minority shareholder who did not pick the timing of the transaction and is not in the position of a willing seller"]; Cavalier Oil, 564 A.2d at 1145 ["(T)he appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain (its) investment position"] ). Nevertheless, the dissenter-like status of a dissociating partner should not be completely ignored. By organizing their business as a general partnership, principals sacrifice limited liability and the free transferability of their equity interests in exchange for, among other things, a statutory right to cash out at any time, subject to their obligation to pay damages if the dissolution is wrongful (see Partnership Law § 69 ; Larry E. Ribstein, **894 *362 The Evolving Partnership, 26 J Corp L 819, 823-824, 849-850 [2001] ). Imposing too great a punishment for exit "swings the pendulum toward permitting oppression of locked-in partners. Indeed, close corporations were long plagued by such problems" (Ribstein, 26 J Corp L at 851 ). ***305 "[T]he problem is one of finding the appropriate balance between these costs of exit and of continuity" ( id. at 850 ). Again, although New York has not adopted the RUPA, it is noteworthy that "[t]he strong support for the statutory buyout [in the RUPA] was influenced by trends in corporate law providing liquidity for a minority participant who wanted out of the business" (Donn, § 701 Author's Comment 2).
The second rationale transposes much more easily to the partnership context. As many courts have observed, there is an analytical flaw in applying a minority discount where the actual purchasers of the minority interest are the remaining shareholders, rather than a hypothetical "willing buyer." The purchasers are not entering into a noncontrolling position, but merely consolidating and increasing whatever degree of control they already have over the business. The Montana Supreme Court's analysis in Hansen v. 75 Ranch Co. is commonly cited:
"Applying a discount is inappropriate when the shareholder is selling her shares to a majority shareholder or to the corporation. The sale differs from a sale to a third party and, thus, different interests must be recognized. When selling to a third party, the value of the shares is either the same as or less than it was in the hands of the transferor because the third party gains no right to control or manage the corporation. However, a sale to a majority shareholder or to the corporation simply consolidates or increases the interests of those already in control. Therefore, requiring the application of a minority discount when selling to an 'insider' would result in a windfall to the transferee. This is particularly true since the transferring shareholder would expect that the shares would have at least the same value in her hands as in the hands of the transferee.... Since there is no 'market' involved in an inside transfer of shares, the minority discount should not be applied" ( Hansen, 957 P.2d at 41 ; accord Brown, 2006 WY 107, ¶ 41, 141 P.3d at 687 ; Arnaud v. Stockgrowers State Bank of Ashland, Kansas, 268 Kan. 163, 169, 992 P.2d 216, 220 [1999] ; see also Brown v. Allied Corrugated Box Co., 91 Cal.App.3d 477, 486, 154 Cal.Rptr. 170 [1979] ["It has been noted ... that the rule justifying the ***306 devaluation of minority shares in closely held corporations for their lack of control has little validity when the shares are to be purchased by someone who is already in control of the corporation. In such a situation, it can hardly be said that the shares are worth less to the purchaser because they are noncontrolling"] ).
Therefore, when setting the strike price of a forced sale of stock to the majority shareholders, a minority discount would simply transfer wealth from those who do not control the corporation to those who do (see In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d at 1005 ) and would "unfairly enrich[ ] the majority shareholders," allowing them to "reap a windfall" ( Friedman, 87 N.Y.2d at 169, 638 N.Y.S.2d 399, 661 N.E.2d 972, quoting Cavalier Oil, 564 A.2d at 1145 ).
Several courts have therefore held that a minority discount should not be applied in valuing a partner's interest, when the purpose of that valuation is to establish the price at which the interest would be sold back to the partnership. In Vick v. Albert, an action for partition and sale of partnership assets and an accounting by surviving *363 **895 partners, the First Department held that a discount for minority lack of control would be unavailable ( 47 A.D.3d at 483-484, 849 N.Y.S.2d 250 ). Although the Court acknowledged that the discount would not "undermine the remedial goal of the appraisal statutes to protect shareholders from being forced to sell at unfair values," it nevertheless held that "application of the discount[ ] ... would deprive plaintiffs of the value of the decedent's proportionate interest in a going concern, since they would not receive what they would have received had the entire entity been sold on the open market unaffected by a diminution in value as a result of a forced sale" ( id. ). Critically, the case hinged on the Court's construction of Partnership Law § 73, which employs the same key phrasing as § 69 (see Partnership Law § 73 [providing that a partner who retires or dies, or such partner's legal representative, is entitled to "the value of (the partner's) interest in the dissolved partnership"] ).
In In re Marriage of Branscomb, a marital dissolution, the court reversed a trial court's judgment applying a minority discount to a husband's interest in a partnership (see 201 Or.App. 188, 117 P.3d 1051 [2005], review denied 339 Or. 544, 125 P.3d 750 [2005] ). The court held that such a discount was inappropriate where, under the terms of the partnership agreement, the husband could not sell his interests on the open market, ***307 but would instead be required to sell it to his partners, or, if they did not want to buy it, to have the partnership's assets sold as a whole and the proceeds distributed pro rata (see 21 Or.App. at 198-199, 117 P.3d at 1058). "In either case, the factual basis for a minority discount would not exist: no buyer would ever be put in the position of owning a minority interest and assuming a minority risk. If the other partners buy husband out, they simply augment their majority status; they would then become sole owners, neither majority nor minority'' ( 201 Or.App. at 199, 117 P.3d at 1058 ).
In East Park Limited Partnership v. Larkin, the Maryland Court of Special Appeals determined that a minority discount should not be applied when valuing a withdrawing partner's interests under the Maryland Revised Uniform Limited Partnership Act (MCA § 10-101 et seq.) (" MRULPA") (see 167 Md.App. 599, 893 A.2d 1219 [2006], cert denied 393 Md. 243, 900 A.2d 749 [2006] ). The MRULPA provided that a limited partner could withdraw at any time, subject to certain conditions and six months' notice, and "receive, within a reasonable time after withdrawal, the fair value of the partner's partnership interest in the limited partnership" (167 Md.App. at 613, 893 A.2d at 1227-28 [emphasis omitted] ); see MRULPA §§ 10-603 [b], 10-604). Although "fair value" was not defined, the court looked to our decision in Friedman, as well as the RUPA, for guidance (see East Park, 167 Md.App. at 614-615, 893 A.2d at 1228 ). The court noted that the purpose of the MRULPA provision at issue, like that of the dissenting shareholder statute, was to allow a partner to "cash out" their interests in order to avoid compelling them to "participate in a corporate course they find objectionable" ( 167 Md.App. at 620-621, 893 A.2d at 1232 ). Moreover, the interests were not being sold to a hypothetical third party, but were to be "absorbed by the partnership entity" itself ( 167 Md.App. at 619, 893 A.2d at 1231 ). Accordingly, the court found the corporate appraisal cases to be on point:
"In both situations, the individuals are exercising a statutory right to withdraw from an entity, and the entity is absorbing the interests of those individuals....
"The application of discounts is appropriate only under a fair market value *364 **896 analysis, that is, in determining what price a willing buyer would offer, ***308 and a willing seller would accept, on the open market.... Here, the application of discounts would unjustly enrich the remaining partners of East Park because they would receive the distributions attributable to the Withdrawing Partners' interests; yet, ... the remaining partners would end up acquiring the interest[s] of the withdrawing partners for less than they were worth if those interests had remained in the hands of the withdrawing partners." ( 167 Md.App. at 620-621, 893 A.2d at 1231-1232 ).
In Winn v. Winn Enterprises, Ltd. Partnership, the Arkansas Court of Appeals held that the trial court erred in applying minority discounts in valuing the interests of a withdrawing member of a family limited partnership (see 100 Ark. App. 134, 265 S.W.3d 125 [2007] ). The court favorably cited East Park and the dissenting shareholder cases, noting that "[i]f discounts are applied, the entity obtains the withdrawing shareholder or partner's interest for less than that interest would be worth in the hands of the withdrawing shareholder or partner" ( 100 Ark.App. at 139-140, 265 S.W.3d 128 ).
Most recently, the Louisiana Supreme Court joined this line of cases when it held that a minority discount should not have been applied to the value of a withdrawing partner's interests in a limited liability partnership (see Cannon v. Bertrand, 2 So.3d 393 [La. 2009] ). The court held that, while "[m]inority discounts ... may have a place" under Louisiana law, "such discounts must be used sparingly" ( id. at 396 ). Specifically, the court held that it was an abuse of discretion to apply the discount where "[t]he buyers of the partnership interest at issue are the two remaining partners in the partnership," who would "not be subject to a lack of control as would a third party," and where the remaining partners "opt[ed] to continue the partnership and avoid liquidation" ( id. ). Although Cannon eschewed a per se rule against minority discounts, and although Louisiana is not a UPA state, Cannon's reasoning would appear to preclude discounts where, as here, the non-dissolving partners elect to continue the partnership and absorb the wrongfully-dissolving partner's interests.
Although the Supreme Judicial Court of Massachusetts embraced minority discounts under UPA § 38(2) (see Anastos, 443 Mass. 146, 819 N.E.2d 587 ), Anastos was focused on a different ***309 legal issue. The issue actually presented and analyzed in Anastos was whether the partnership should be valued at liquidation value or as a going-concern (see id. at 590-592 ). The court correctly concluded that going-concern value, rather than liquidation-value, was the appropriate measure, where the remaining partners elect to continue the partnership's existence under UPA § 38(2)(b) (see id. ). However, after concluding that the partnership should be valued as a going concern, the court's only discussion of the minority discount issue was its statement that the trial court's "use of a forty per cent minority shareholder discount [was] well supported by the evidence and therefore not clearly erroneous" ( ibr.US_Case_Law.Schema.Case_Body:v1">id. at 592 ). The Anastos court simply assumed that if the partnership were valued as a going-concern, rather than at liquidation value, then the interest should be valued piecemeal, rather than as a proportionate share of the business as a going-concern. The court never explained why this assumption should hold, and, as explained above, cases decided after Anastos have challenged it (see Vick, 47 A.D.3d at 483-484, 849 N.Y.S.2d 250 ; East Park, 167 Md.App. 599, 893 A.2d 1219 ; Winn, 265 S.W.3d 125 ). *365 **897 A number of authorities have criticized the feasibility of applying a minority discount. In the corporate context, "[d]iscounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings" ( Cavalier Oil, 564 A.2d at 1145 ; accord HMO-W Inc. v. SSM Health Care System, 234 Wis.2d 707, 611 N.W.2d 250, 256 [2000] ).
"Courts have not ... agreed on a clear standard for the proper discount figure, and they have applied considerably different discounts. Discounting thus complicates judicial [appraisals], and makes it even more difficult for private parties to anticipate likely appraisal practices. Denying a minority discount, on the other hand, comports with fairness, simplifies the valuation process, and facilitates negotiations between parties" (Robert B. Heglar, Note, Rejecting the Minority Discount, 1989 Duke L J 258, 276 [1989] ; see also Miller, 13 U Pa J Bus L at 635-636 [arguing against minority discounts in limited liability company ("LLC") valuation proceedings, because "LLC jurisprudence should be developed in a way that maximizes certainty and ***310 predictability as much as possible" and "the minority discount creates substantial uncertainty in the setting of the LLC"] ).
Minority discounts would essentially randomize the partnership's liability in many wrongful dissolution cases, hindering the dissolving partner's ability to settle the dispute out of court based on a reliable and predictable computation of the "value of [its] interest."
Finally, if the purpose of the minority discount is to deter or punish "wrongful" conduct, as the Appellate Division below implied (see Congel v. Malfitano, 141 A.D.3d 64, 73, 32 N.Y.S.3d 264 [2d Dept. 2016] ), then it is certainly a peculiar way to do so. The brunt of this penalty will fall disproportionately on minority partners, the class of partners whose withdrawal is least likely to cause a disturbance, but whose exit rights are most important, due precisely to their lack of control over the business. This would "inflict a double penalty" upon the minority partner ( Brown, 141 P.3d at 683, quoting HMO-W, 611 N.W.2d at 257 ); the partner not only lacks control over operational decision making, but would then receive less than a proportionate value because of that lack of control. Indeed, by the majority's own logic, if a wrongful dissolver is a majority or controlling partner-precisely the kind of partner whose dissociation will most damage the business-that partner may now be entitled to a control premium under Partnership Law § 69(2)(c)(II), since this would reflect the amount that a willing third-party buyer would pay for a majority stake (see majority op. at 296 and 296 n. 12, 76 N.Y.S.3d at 887 and 887 n. 12, 101 N.E.3d at 355 and 355 n. 12). The structure of Partnership Law § 69(2)(c)(II) already deters wrongful dissolution in two ways: by requiring the dissolving partner to pay damages, and by discounting the value of its partnership interests attributable to goodwill. A further discount for a lack of control is cumulative and unnecessary in light of these other provisions.
In defining the "value of [the partner's] interest in the partnership," the question does not turn on whether a particular method of valuation is 'accurate,' but whether that valuation will lead to an allocation of wealth as between these partners that best advances the legislative scheme. "Value" can mean many different things, and the definition we embrace should be guided by the ends that the legislature sought to implement when it enacted the Partnership Law. Here, the court applied a minority discount of $1,768,552.50 to appel **898 ***311 lant's *366 partnership interests, which were stipulated to be worth $4,850,000 without adjustments (see majority op. at 284, 76 N.Y.S.3d at 879, 101 N.E.3d at 347). The question is, in an action for wrongful dissolution, where the partnership is continued as a going concern, which party has the greater right to that $1,768,552.50 portion of appellant's interests-the controlling partners, or appellant himself? For the reasons discussed above, I believe this question should resolve in appellant's favor, and the order of the Appellate Division should be modified accordingly.
Judgment appealed from, and orders of the Appellate Division brought up for review, modified, without costs, by remitting the case to Supreme Court, Dutchess County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.
Judges Rivera, Stein, Garcia and Wilson concur. Judge Feinman dissents in part in an opinion in which Chief Judge DiFiore concurs.

Plaintiffs did not take the position that defendant's action had no legal effect and failed to dissolve the Partnership. On appeal, plaintiffs concede that the Partnership dissolved by operation of law. The dispute concerns whether the dissolution violated the agreement. Consequently, we have no occasion to consider whether plaintiffs would prevail if they had argued that under the agreement a purported unilateral dissolution is no dissolution at all.

The judicial dissolution statute, Partnership Law § 63, gives a partner the statutory right to seek court dissolution of a partnership, and provides that a court shall decree the dissolution, on a partner's application, in various situations, including circumstances that would "render a dissolution equitable" (Partnership Law § 63 [1 ] [f] ). Defendant did not seek judicial dissolution prior to unilaterally dissolving the partnership.

The trial court granted defendant postjudgment interest.

Addressing the question of when a partnership agreement specifies a "definite term" or "particular undertaking" within the meaning of Partnership Law § 62, this Court adopted the rule that "a 'definite term' ... is intended to be durational in nature and refers to an identifiable termination date," while "[a] 'particular undertaking' ... require[s] a specific objective or project that may be accomplished at some future time, although the precise date need not be known or ascertainable at the time the partnership is created" (Gelman, 20 N.Y.3d at 537-38, 964 N.Y.S.2d 80, 986 N.E.2d 914 [citations omitted] ).

In resolving whether Gelman required a reassessment of its earlier rulings, the Appellate Division alluded, in passing, to the "law of the case" doctrine, but proceeded to distinguish Gelman, rather than consider whether that decision introduced a change in the law (141 A.D.3d at 70, 32 N.Y.S.3d 264 ). Contrary to defendant's assertion, the Appellate Division did not consider examination of Gelman to be foreclosed. Nor do we.

As we have noted (see footnote 1), plaintiffs do not argue that defendant's action had no legal effect and failed to dissolve the Partnership. Consequently, we have no occasion to consider whether the agreement left no room for any other means of dissolution, whether proper or wrongful.

Accordingly, there is no need for us to determine whether Supreme Court erred in deciding that the agreement contained a "particular undertaking" or whether the Appellate Division erred in deciding that the agreement contained a "definite term."

For example, the record contains a reference to $14,640 incurred in attorneys' fees for legal advice and attendance at partner meetings prior to the commencement of the lawsuit, to ensure "formal partnership action to make sure with clarity to the lender that all steps were being taken that were necessary to continue the business." This would correspond to a very small percentage-0.539% by our calculation-of the attorneys' fees plaintiffs originally requested, and defendant accordingly asserts that the great majority of the fees claimed by plaintiffs were related to the litigation of their action.

Defendant observes that the Partnership did not manage the mall, solicit tenants, negotiate leases, or have employees; that was the job of its agent, Pyramid Companies. Nevertheless, even though the Partnership was not directly responsible for day-to-day operations, it owned a shopping mall, with local reputational advantages, from which the Partnership derived goodwill value, just as Pyramid might have goodwill for responsible management of malls.

A minority discount is not relevant in valuing an asset, such as a publicly traded share, that is already priced as a minority holding, the fair market value of which can be determined simply by examining the market price of the stock.

Defendant has not preserved any objection to the percentage of the discount. Consequently, we do not address the lower courts' determination of the size of the minority discount.

"The fair market value is the price at which [an asset] would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts" (Estate of Godley v. C.I.R., 286 F.3d 210, 214 [4th Cir. 2002], quoting United States v. Cartwright, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 [1973] ).

Our holding is not "that the trial court was required to apply a minority discount" (dissenting op. at 299, 76 N.Y.S.3d at 889, 101 N.E.3d at 357 [emphasis added] ). We need decide only whether the application of a minority discount in this case was contrary to law.

The federal tax refund cases from which the majority's "willing-buyer-willing-seller" methodology is appropriated are simply applying a definition of "value" promulgated by the United States Department of the Treasury (see 26 C.F.R. §§ 20.2031-1 [b], 2512-1; U.S. v. Cartwright, 411 U.S. 546, 550-551, 93 S.Ct. 1713, 36 L.Ed.2d 528 [1973] ). It is because of these regulations that Tax Courts permit a discount for lack of control in assessing the "value" of a minority interest (see Estate of Andrews, 79 T.C. at 954-955, discussing Estate of Bright v. U.S., 658 F.2d 999 [5th Cir. 1981] [en banc] ). "No purpose [would be] served by questioning the wisdom of the hypothetical party standard" in tax refund cases, "because that is the required measure as established by law, and so it will remain unless Congress changes it" (James Edward Harris, Valuation of Closely Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts, 42 Ark L Rev 649, 668 [1989] ).

RUPA § 701 is the "counterpart" to UPA § 38(2) (see Larry E. Ribstein, The Revised Uniform Partnership Act: Not Ready for Prime Time, 49 Bus Law 45, 66 [1993] ). The RUPA, like the UPA, requires this sum to be offset against any damages that a partner must pay for a wrongful dissociation (see RUPA § 701 [c] ). Unlike the UPA, however, it contains no discount for goodwill (see id. § 701 [b], Comment).